**IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| WILLIE BREWER | * | |
| *Plaintiff*, | * | |
| v. | * | CASE NO. 1:11-CV-01206-KBJ |
| DISTRICT OF COLUMBIA, et al. | * | |
| *Defendants,* | * | |

---

**PLAINTIFF'S RESPONSE TO THE DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Plaintiff, through undersigned counsel, hereby responds, to Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment ("Motion").  In so doing, Plaintiff incorporates Defendant's standard for dismissal and summary judgment motions, and responds to Defendant's arguments as follows:

I.        Judge Bartnoff's Opinion Expressly Avoided Analysis of Plaintiff's Claims.

Although the same event triggered both the Union lawsuit and the instant case, and the legal analysis necessary for each case is strikingly different.  It is true that both complaints arose in part from a single event:  the mass termination of the DCPS teachers in the fall of 2009 that Chancellor Michelle that the Chancellor asserts complied with D.C. Code § 1-608.01a ("Reduction in Force", and hereafter referred to as the "RIF Statute.").  It is also true that both Plaintiff Willie Brewer in the instant case, and the Union as part of its litigation, each asserted in their Complaints that the mass discharge at issue was designed to promote the Chancellor's

agenda of hiring younger teachers.  However the legal theories presented, and thus standards for

determining the unlawfulness of the mass discharge, are dramatically different in the two cases.

The threshold for the mass discharge in the Union case was simply whether Chancellor

Michelle Rhee  had a reasonable belief that a budget shortfall existed when she effected the mass

discharge.  See *Transcript, Union Litigation Motions Hearing, April 23, 2010, at 7.*   The

collective bargaining agreement ("CBA") between the Union and the District of Columbia limits

the ability of DCPS to perform "mass discharges."  The issue in the Union litigation was whether

this provision encompassed the Fall 2009 discharge.  Because the court found that Rhee's belief

was reasonable, the Court opined that the Fall 2009 terminations would not be considered "mass

discharges," as this term was defined in the CBA, and therefore the Union's dispute could not be

addressed through the CBA grievance arbitration procedure.    Thus, the Union litigation was in

essence over whether the CBA provided the Union with any remedy for the mass discharge.  It

was not an individual claim, and it was not based upon statutory law.  Judge Bartnoff's

interpretation was based on her analysis of the mass discharge provision of the collective

bargaining agreement between the Union and the District of Columbia, which did not discuss or

define reductions in force while limiting DCPS is ability to conduct "mass discharges."  The

right to arbitrate under the CBA was the essence of the relief sought by the Union, not to contest

whether the RIF complied with the requirements of the RIF statute:

> THE COURT:  If there is an issue at all, it seems to me the issue now is whether it
> was reasonable for the chancellor to believe last fall that there was a budget
> shortfall that justified the RIF.
>
> *Transcript, at 7, quoting Judge Bartnoff, Union Litigation Motions Hearing, April
> 23, 2010.*

By contrast, in the instant case, the critical legal question is whether the mass discharge

was *necessary,* as opposed to whether it was a reasonable option for the Chancellor.

Supplemental Complaint, at ¶¶ 6,22.  Budgetary necessity is a requirement for large terminations

pursuant to the RIF Statute.[1]  This requirement of the RIF Statute is far more burdensome than

one for a reasonable belief to believe a budget shortfall existed.  Judge Bartnoff's finding that

Chancellor Michelle Rhee had a reasonable basis to believe that a budget shortfall has absolutely

no impact on the budgetary necessity question, as the Court opined and repeatedly clarified

during an evidentiary hearing in the Union litigation:

> THE COURT:  [L]et me also make it clear that the issue for me is not whether or
> not the chancellor was correct in choosing to RIF vs. choosing to not cut the grass
> for a year that statute that something that's even within the DCPS budget, which I
> had no idea if it isn't not that's their for choosing not to buy any paper or pencils.
>
> The issue is, did she -- her decision about how she chooses to allocate the school
> system's resources is not something the court is in a position to review.....
>
> But the point is: whether or not they considered other options, and whether the
> other options -- whether you [addressing Union Counsel] think the other options
> would been better or not, doesn't affect the issues in this case.
>
> *Transcript, at 128, quoting Judge Bartnoff, Union Litigation Motions Hearing,*
> *November 5, 2009.*
>
> ("Although the Union may have proposed other actions that could have been
> taken to address the budget problem, it is not for the Court to second-guess the
> judgments of the Mayor and the Chancellor regarding how to manage DCPS.")
>
> *Bartnoff Opinion,* at 4.

All parties to the Union litigation, including the Union Counsel, thus agreed that the issue

of whether Michelle Rhee had options aside from the mass discharge (e.g., the elimination of

summer school, as initially recommended by the Council, or the firing of the newly hired

probationary teachers, who had not yet started school) was irrelevant to the Union litigation.

Indeed, unlike the Plaintiff, the Union did not even contest whether any RIF procedures were

properly followed. *Union Complaint* (*Defendant's Motion*, Exhibit 3).  Finally, the Court noted

---

[1] A RIF is a reduction in personnel, the need for which shall be declared by the Mayor,  which is *necessary*
due to a lack of funding.  D.C. Code § 1-608.01a  (Emphasis added).

all that issues surrounding the execution of the RIF itself were outside of its scope, and refused to evaluate evidence on these issues.

From Plaintiff Brewer's perspective, examples of factual evidence of RIF improprieties that the Bartnoff Court was both unable and unwilling to address include the Chancellor's false or misleading statements to the City Council about new hiring and budgetary pressures, and the DCPS' failure to create priority reemployment lists. *Supplemental Complaint,* at ¶¶ 27,33. These issues were not pled or asserted in the Union litigation.  See *Union Complaint* (*Defendant's Motion*, Exhibit 3)

The instant complaint contains age discrimination counts under both Federal and local employment discrimination statutes.  In addition, it contains a deprivation of civil rights count and a fraud count stemming from the Chancellor's alleged improprieties and concealment as part of the RIF process.  Finally, it contains a breach of contract count which is based on a signed written agreement between Plaintiff Willie Brewer and the District of Columbia government that contains language that commits Mr. Brewer to a period of employment beyond his actual termination date.  None of these theories were asserted by the union as a part of their litigation, or addressed by the Bartnoff Court in its opinion.  In short, Judge Bartnoff's opinion resolves no legal or factual issue in the instant case.

II.      Union Grievances/Arbitrations Do Not Preclude Plaintiff Brewer's Individual
         Statutory Claims

Having clarified the lack of overlap between the legal claims of the Union and those of Plaintiff Willie Brewer, the next issue is to address the Defendant's argument that Plaintiff Willie

Brewer's claims should nonetheless be precluded simply because "arose from the same nucleus

of facts," as argued by the Defendant.  See *Defendant's Motion*, at 6, citing *Capitol Hill Group v.*

*Pillsbury Winthrop Shaw Pittman, LLP*, 574 F. Supp. 2d 143, 149 (D.D.C. 2008).    With respect to

the age discrimination counts and deprivation count under 42 USC § 1983, the answer is

remarkably easy.  In *Alexander v. Gardner-Devner Co.,* 415 U.S. 36 (1974), the Supreme Court

held that an employee was not precluded from filing an individual age discrimination claim

under Title VII, even though he had filed a prior discrimination-related claim pursuant to his

bargaining agreement and grievance process:

> [T]he legislative history of Title VII manifests a congressional intent to
> allow an individual to pursue independently his rights under both Title VII and
> other applicable state and federal statutes.  The clear inference is that Title VII
> was designed to supplement, rather than supplant, existing laws and institutions
> relating to employment discrimination. In sum, *Title VII's purpose and*
> *procedures strongly suggest that an individual does not forfeit his private cause of*
> *action if he first pursues his grievance to final arbitration under the*
> *nondiscrimination clause of a collective-bargaining agreement.*
>
> In reaching the opposite conclusion, the District Court relied in part on the
> doctrine of election of remedies [which the court later notes is equivalent to the
> res judicata and collateral estoppel doctrine for analysis purposes].  That doctrine,
> which refers to situations where an individual pursues remedies that are legally or
> factually inconsistent, has no application in the present context. In submitting his
> grievance to arbitration, an employee seeks to vindicate his contractual right
> under a collective-bargaining agreement. By contrast, in filing a lawsuit under
> Title VII, an employee asserts independent statutory rights accorded by Congress.
> *The distinctly separate nature of these contractual and statutory rights is not*
> *vitiated merely because both were violated as a result of the same factual*
> *occurrence.* And certainly no inconsistency results from permitting both rights to
> be enforced in their respectively appropriate forums.
>
>      *Alexander,* at 47-50.[2] (Emphasis added)

---

[2] While the excerpt above mentions the doctrine of "election of remedies," the Court specifically added that
"the policy reasons for rejecting the doctrines of election of remedies and waiver in the context of Title VII are
equally applicable to the doctrines of *res judicata* and collateral estoppel."  *Alexander*, at fn. 10.

The doctrine of *Alexander,* which analyzed claim preclusion in the Title VII context also applies to ADEA.  See e.g., *14 Penn Plaza LLC v. Pyett,* 129 S. Ct. 1456, at 1465  (employee files ADEA claim after his union had filed discrimination grievances under the collective bargaining agreement)  ("[A]an agreement to arbitrate statutory antidiscrimination claims [must] be "explicitly stated" in the collective-bargaining agreement [to preclude litigation]"), citing *Wright v. Universal Maritime Service Corp.,* 525 US 70 (1998), at 80.  This language disposes of Defendant's election of remedies argument by clarifying the distinct nature of employment remedies under the collective bargaining system and the statutory system.  Both the *Alexander* plaintiff and Plaintiff Brewer are entitled to pursue each type of remedy, and they do not have to choose between the two, in spite of Defendant's "nucleus of facts" argument.  Indeed, the cases cited by the Defendant arguing for claim preclusion only involve similar collective bargaining disputes, not where a plaintiff is pursuing individual statutory claims after his union is pursuing claims based on a collective bargaining agreement.  See *e.g., Adams v. Pension Ben. Guar. Corp.*, 332 F.Supp.2d 231 (2004)  (rejecting challenge to pilots' retirement plan settlement agreement negotiated in bankruptcy by employment union and airline)  ("Plaintiffs [employee-pilots] concede that they, were represented for *collective bargaining purposes* by the [Pilots' union].") (Emphasis added); *Meza v. General Battery Corp.,* 908 F. 2d 1262, 1268 (5th Cir. 1990) (dispute over disability benefits set out in the 1981-1984 collective bargaining agreement); *Monahan v. New York City Dep't of Corrections,* 214 F. 3d 275 (2nd Cir. 2000) (stipulation between Union and municipal agency to modify a sick leave policy negotiated under the bargaining agreement and release all parties from sick-leave related claims was binding on employees).

The Supreme Court also eviscerates Defendant's "nucleus of facts" argument with respect to 42 USC § 1983 by specifically extending the holding in *Alexander* to these claims in *McDonald v. West Branch,* 466 U.S. 284 (1984).  In that case, a terminated police officer grieved his termination under his union's collective bargaining agreement, asserting insufficient cause. An arbitrator found against the terminated officer, and he did not appeal.  However, the officer then filed a claim under 42 U.S.C.§ 1983.  Ruling that the officer claims were not precluded by the arbitration decision, the Court held:

> Our rejection of a rule of preclusion in *Barrentine* and our rejection of a rule of deferral in *Gardner-Denver* [*i.e.,* the *Alexander* case cited herein] were based in large part on our conclusion that Congress intended the statutes at issue in those cases to be judicially enforceable and that arbitration could not provide an adequate substitute for judicial proceedings in adjudicating claims under those statutes. 450 U. S., at 740-746; 415 U. S., at 56-60. These considerations similarly require that we find the doctrines of res judicata and collateral estoppel inapplicable in this § 1983 action.

> *McDonald v. West Branch,* 466 U.S. 284 (1984), at 289.[3]

With respect to Plaintiff's age discrimination claims under the D.C. Human Rights Act, the Supreme Court's rationale leads to the same conclusion:

> Legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination. In the Civil Rights Act of 1964, Congress indicated that they considered the policy against discrimination to be of the "highest priority." Consistent with this view, Title VII provides for consideration of employment discrimination claims in several forums. And, in general submission of a claim to one forum does not preclude a later submission to another. Moreover, the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and *other applicable state and federal statutes*.   *Alexander,* 415 U.S. at 47. (Emphasis added)

The District's age discrimination laws were designed to supplement ADEA remedies, which in turn  were designed not to preclude remedies under collective bargaining agreements.

---

[3] Note that the reasoning behind *Alexander* and *McDonald* applies to cases (such as the instant case) where the employee has not expressly agreed to resolve his dispute solely through arbitration.

Local age discrimination claims were created to provide additional protection that ADEA did not

provide, and were specifically drafted not to conflict with ADEA to avoid preemption.  State

statutory age discrimination claims that supplement ADEA, for purposes of claim preclusion

analysis, are analogous with state statutory race discrimination claims that supplement Title VII.

The Ninth Circuit came to the same conclusion in *Prudential Ins. Co. of America v. Lai,*

42 F. 3d 1299 (1994), in holding that an arbitration did not have a preclusive effect on statutory

state law claims.  In *Prudential,* employees sued the defendant and their immediate supervisor in

state court on a variety of state law claims, alleging that the supervisor had raped, harassed, and

sexually abused them in a number of ways:

> This congressional concern that Title VII disputes be arbitrated only
> "where appropriate," and only when such a procedure was knowingly accepted,
> reflects our public policy of protecting victims of sexual discrimination and
> harassment through the provisions of Title VII *and analogous state statutes*….
>
> Thus, we conclude that a Title VII plaintiff may *only be forced to forego
> her statutory remedies and arbitrate her claims if she has knowingly agreed to
> submit such disputes to arbitration.  Prudential,* at  1304-5. (Emphasis added)

As Plaintiff Brewer never agreed to waive arbitration, Prudential affirms his right to

District-specific remedies for age discrimination, as well as his ADEA claims.[4]

With respect to Plaintiff's § 1983 claim, Plaintiff claims that he was deprived of his

Constitutionally-protected right to employment due to the defendants' intentional misuse of the

RIF statute, through Chancellor Rhee's and DCPS Chief Financial Officer Noah Wepman's

factual misrepresentations and/or omissions to City Council, and through the failure to enact a

priority reemployment policy.  See e.g., *Chicago Teachers Union v. Bd. of Educ. of Chicago*,

640 F. 3d 221 (7th Cir. 2011) (terminated teachers have a "cognizable property interest" in being

---

[4] The holding in *14 Penn Plaza* would later determine that an arbitration clause in the collective bargaining
agreement equates to a knowing waiver of litigation rights by an employee covered under the clause.  There was no
arbitration clause in Plaintiff Brewer's CBA.

considered for future employment vacancies under 42 USC § 1983). This legal theory is completely distinct from ADEA; it both supplements the age discrimination count and provides an alternate theory for liability where the mass discharge was unnecessary, even in the absence of discrimination. As such, it cannot be subsumed by the ADEA claim.

III.   Plaintiff Was Constructively Terminated, As His Election of Voluntary Retirement Was Contrived

Plaintiff was constructively terminated from DCPS in October 2009, because 1) his separation was imminent under the RIF instruction letter of October 2, 2009 (hereafter "RIF Letter"; *Defendant's Motion,* at Exhibit 1) he received at the time, and 2) the RIF Letter implied that he had to accept voluntary retirement to receive his annuity, even though he would have received the same annuity had he simply accepted separation:

> Beginning immediately, you will be on paid administrative leave until November 2, 2009, the effective date of your separation….
>
> You may be eligible to retire in lieu of being separated from service. If you are fifty (50) years old with twenty (20) or more years of service … you are eligible for the Discontinued Service Retirement Annuity (DSRA). Your retirement annuity will be reduced by 2% for each year you are short of age fifty-five (55). If you are eligible for the DSRA, you may submit your completed retirement application to the Office of Human Resources no later than November 2, 2009.

*RIF Letter,* at 1.

The RIF Letter, therefore, appeared to present Plaintiff with the choice of receiving the DSRA, or separation. However, this was not a real choice, as Plaintiff was entitled under the D.C. Code to an annuity of the same amount regardless of whether he voluntarily retired or not:

> Voluntary and involuntary retirement
>
> Any teacher who completes 5 years of eligible service and who is involuntarily separated from the service, except by removal for cause on charges of misconduct or delinquency, after… becoming 50 years of age and completing 20 years of

service; is entitled to an annuity reduced by one-sixth of 1% [equivalent to 2% per year] for each full month said teacher is under the age of 55 years at the date of his separation from the service.

*D.C.Code, § 38-2021.03*

Faced with separation, Plaintiff did not have two rational choices:  he only had one choice disguised as two.  Voluntary separation afforded him no benefits that he would not have otherwise received.  The Defendants' deceptive maneuver to frame voluntary retirement as a prerequisite to annuity payments should not be rewarded by forcing Plaintiff to forfeit his rights to challenge his unlawful termination, or deprivation of priority reemployment opportunities.[5]

IV.    Plaintiff's Clarification of the Fraudulent Misrepresentation Count

With respect to the fraudulent misrepresentation count, Plaintiff Brewer intends to assert that as a result of misrepresentations Defendants Rhee and Wepman made to the public (to wit: public officials on the City Council) regarding the extent of hiring of the new teachers, and/or as a result of the RIF Letter, Defendants Rhee and Wepman were able to eliminate his position and deceive him into agreeing to voluntary retirement.  Plaintiff requests leave to amend his complaint to clarify this factual predicate, to the extent that it has not yet been sufficiently pled.

V.    Plaintiff's Clarification of the Breach of Contract Count

Plaintiff recognizes that his breach of contract count is based on a memorandum that serves to amend the collective bargaining agreement, and that this memorandum is not signed by

---

[5] Note that if Plaintiff were reemployed by the District, his annuity payments would immediately cease, via an offset deduction from his current pay.  *D.C. Code,* §1-611.03(b).

the Plaintiff.  Plaintiff thus seeks to amend the complaint to assert this count under § 301 of the

Labor Management Relations Act.

WHEREFORE, Plaintiff requests that Defendant's Motion be DENIED.  In the

alternative, Plaintiff requests that Defendant's Motion be GRANTED only as to the fraudulent

misrepresentation count and breach of contract count, with leave to amend those counts.

_____
Kerry J. Davidson, Esq.
1738 Elton Road, Suite 113
Silver Spring, MD  20903
Email  kdavidson@selflaw.com
Tel: (301) 563-9816
Fax: (866) 920-1535
Bar No.: 456431
September 23, 2013

## CERTIFICATE OF SERVICE

Defendant for the District of Columbia's counsel of record, Joseph Gonzalez, has been

served with the foregoing PLAINTIFF'S RESPONSE TO THE DEFENDANT'S MOTION TO

DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT via electronic filing

on September 24, 2013.

_____
Kerry J. Davidson, Esq.