1    Q    In the several weeks of this school year that

2    you did work for DCPS, what were some of the projects

3    that you begun working on for the school year?

4    A    Well, because I was the lead counselor, I had

5    already developed the entire counseling comprehensive

6    counseling schedule for the year.  I run some of the

7    largest college nights in the City.  So I had already

8    scheduled for over 100 colleges to come to Calvin

9    Coolidge to identify our students.

10        My biggest job is from the spring of last year

11   to now.  I had to get to know every senior, because I

12   am the one that have the credibility with the

13   institution of higher education.  So I had to know all

14   those students.  So I was doing that.  Amongst that, I

15   had set up, on the calendar, all of the parent and

16   teacher professional developments in regards to how we

17   sustain students with high absenteeism, how to deal

18   with suspensions.  All of that was part of my calendar

19   that I had worked out as well as preparing students

20   letters for them to go to college.

21        One of the biggest things in getting accepted to

22   college, as we all know, it's no longer only

23   standardized tests, it is the recommendation of the

24   counselor.  So it has taken me a good portion of this

25   year to work on those recommendations and with those

1    students.   Those are just some of the things.

2        Q    How did you come to stop working for DCPS?

3        A    I can't -- by the RIF.

4        Q    Have you made any attempts to find work since

5    you learned of your impending termination?

6        A    Yes, I have.

7        Q    Where have you applied?

8        A    I've applied to the county schools and to

9    Independent School.

10       Q    And have you gotten any response from your

11   applications?

12       A    Yes, I have.

13       Q    Have you told perspective employers why you left

14   DCPS six weeks into the school year?

15       A    No, I have not.

16       Q    Why not?

17       A    Well, because of the media and because of no

18   good news coming out of D.C. Public Schools, I didn't

19   want to prejudice their opinion of what they had seen

20   on paper about me and to make them think that I was a

21   low performing counselor or employee.

22       Q    Turning again to the children that you left

23   behind at Coolidge, it is your sense that the other

24   two remaining counselors can do what you were doing?

25           MR. UTIGER:   Objection, your Honor.

1          THE COURT:   Sustained.

2          BY MS. ZWACK:

3     Q     When you left, did you have any outstanding

4     work-related meetings or commitments with contacts

5     outside of DCPS?

6     A     Yes, I did.   I had the over 100 letters of

7     invitations to our school to come to our College

8     Night.   I also had secured for D.C. Public School and

9     Coolidge High School large contractual agreement with

10    New York Life to do large college summit for

11    Coolidge -- to be hosted by Coolidge High School for

12    CFES.

13          I also had established a lot of colleges and

14    universities for the students at Calvin Coolidge High

15    School because I -- they know me and they know my

16    credibility.   They know that I would give them good

17    choices to be in their colleges and universities.   And

18    so those were --

19          THE COURT:   You had a lot of established

20    relationships?   Is that right?

21          THE WITNESS:   Right.   And I had worked hard to

22    get our students appropriate for those relationships.

23          BY MS. ZWACK:

24    Q     How long did it take you to develop these

25    contacts?

77

1    A    Well, it takes years to develop that kind of

2    credibility.  I had been -- I have been working hard

3    on my credibility since my early years as a counselor

4    from Sidwell Friends School to the Latin School of

5    Chicago where I was responsible for all of the college

6    career directors.  And even down to the point where I

7    was supervising an area college, all of their interns

8    who were at our school this year.

9    Q    You've described your background as including

10   three graduate degrees including two terminal degrees,

11   experience as a principal, professor and numerous

12   years as a guidance counselor.

13        Why have you chosen to work for DCPS for all

14   these years?

15   A    Well, everybody finally find their passion.  I

16   really wanted to lobby on Capitol Hill as a lawyer,

17   but when I came back to D.C. as a counselor, I really

18   found my niche.  I have a real understanding of the

19   needs of the students of D.C.  I am not a

20   Washingtonian, but I live in D.C.  I paid my taxes

21   there.  I live around these students.  And so my

22   passion is there, to get the kids to the next level.

23        I was -- and after being invited to Capitol Hill

24   to testify for the reauthorization of the D.C. TAG

25   Program, it, again, inspired me to stay there and do

1    the long hall to deal with those students who I had so

2    vigorously argued on Capitol Hill to give us the D.C.

3    TAG money, that I should be there to get those students

4    to utilize that money.  And I have been very

5    successful.

6          In all my years here, I don't think there has

7    been a year that I've made under $2 million for the

8    school districts where I've been in.

9    Q    Have you had any contact with any of your former

10   students from Coolidge since you've been RIFed?

11   A    I have had loads of contact because I live in

12   the community and I went back to Coolidge because it

13   was my community school.  So, I have had loads of

14   contact with those students who -- yes, I have.  And

15   as a matter of fact, 250 of them delivered to me a

16   petition for my return of the 600 students.

17   Q    If you were forced to find another job, do you

18   think that you would be likely to quit that job and

19   then return to DCPS if the Union was later able to

20   prevail in arbitration?

21   A    I love my community in which I live, but I also

22   believe that I should have -- I should be able to

23   pursue my life, liberty and well being and to -- under

24   the current administration, I would be leery to come

25   back in lieu of the fact that I want to be able to --

79

1     I would be leery to come back because I don't know how

2     long I could stay, whether it would be always up and

3     down like I've had.

4            MS. ZWACK:   Okay.  I am turning the witness.

5            THE COURT:  Can I just ask you.  So you were at

6     Coolidge for one year plus -- and how long were you at

7     Wilson?

8            THE WITNESS:  Since 2002 or one.

9            THE COURT:  Okay.  Thank you very much.

10           MR. UTIGER:  I have no questions of Dr. Bennett.

11           THE COURT:  Thank you very much.  That's it.

12           Why don't we take a ten-minute break.   The court

13     reporter has certainly earned it.

14            (Whereupon a recess was taken from 11:23 a.m.

15     until 11:34 a.m.)

16           THE COURT:  Do you want to call your next

17     witness.

18           MR. JACKSON:  The Union next calls Maurice

19     Asuquo.

20                  * * * * *

21     Thereupon,

22                **MAURICE ASUQUO,**

23     having been called as a witness for and on behalf of

24     the Plaintiff and having been first duly sworn by the

25     Deputy Clerk, was examined and testified as follows:

80

**DIRECT EXAMINATION**

2        BY MS. ZWACK:

3      Q    Mr. Asuquo, will you identify yourself for the

4  record, please, and go ahead and spell your name.

5      A    Sure.  My name is Maurice, M-A-U-R-I-C-E,

6  initial E.  Then, the last name is Asuquo,

7  A-S-U-Q-U-O.

8      Q    Mr. Asuquo, where were you last employed?

9      A    I was last employed at Sharp Health School.

10     Q    And when did you stop working for DCPS?

11     A    I started working at DCPS -- with DCPS

12  September 17th.  I'm sorry.  September 17, 1991.

13     Q    And when did you stop working for DCPS?

14     A    Effective November 2nd, 2009 stopped working for

15  DCPS.

16     Q    What was the reason that you stopped working for

17  DCPS?

18     A    I was part of the RIF.

19     Q    How long had you worked at Sharp Elementary?

20     A    I started working at Sharp Health in 2006,

21  June 5th.

22     Q    How long had that current principal been there?

23     A    The current principal has been there -- I met

24  her for the very first time August of 2007/2008 School

25  Year.

1    Q    And what were you teaching when she first

2    arrived?

3    A    I was teaching Braille to blind and visually

4    impaired students, and I was also teaching

5    communication skills development course, language

6    arts.

7    Q    Did she ask you to teach something else?

8    A    Yes, she did.

9    Q    What was that?

10    A    On or about December 2007, the principal asked

11    me to teach visual arts.

12    Q    What do you mean by visual arts?

13    A    Well, visual arts, the way I understand it,

14    would involve drawing, painting and things of that

15    nature.

16    Q    Did you tell her that you could not teach visual

17    arts?

18    A    Of course.

19    Q    Why not?

20    A    Well, first of all, you need to see in order to

21    teach visual arts to draw and paint.  I thought it was

22    obvious.  And secondly, and really also firstly, I'm

23    not certified in visual arts.

24    THE COURT:  And at that time what were you

25    teaching?

1          THE WITNESS:  I was -- I'm a Special Ed teacher,

2     so --

3          THE COURT:  I know.  So at that time, what were

4     you teaching?

5          THE WITNESS:  Prior to teaching -- being asked

6     to teach visual arts?

7          THE COURT:  Yes.

8          THE WITNESS:  I was teaching braille.  I was

9     teaching communication skills development, and I was

10    also teaching assistive technology, using specialized

11    tools to train the blind, something like this.  This is

12    like an example of the equipment that the blind people

13    use to write.

14         THE COURT:  The record will show that Mr. Asuquo

15    has a very interesting thing that looks a little bit

16    like a keyboard that's around his neck.

17         Is that right?

18         THE WITNESS:  That's correct.  It's called the

19    Braille 'n Speak.

20         THE COURT:  Uh-huh.  Can you tell us what it

21    does since you've shown it to us?

22         THE WITNESS:  Sure.  I will turn it on, and you

23    hear it talks to you because it has no screen.  It is a

24    computer of such, but it talks.  There's no screen.  So

25    you need to listen to hear it.  Let me turn it up a

83

1    little bit.

2         And if you spell your name, I can type it in

3    here and it will read it out.

4         THE COURT:  In other words, if I tell you and it

5    tells me?

6         THE WITNESS:  If you spell it for me, I will

7    type it in.

8         THE COURT:  B-A-R-T-N-O-F-F.

9         THE WITNESS:  And I'm going to make it say it.

10        THE COURT:  Got it right.

11        BY MS. ZWACK:

12   Q    Did you, in fact, teach visual arts?

13   A    I had no choice.  I was forced to teach it.

14   Q    And was this to sighted students?

15   A    Mainly sighted students.  Over 95 percent of the

16   school was sighted students.

17   Q    How long were you required to teach visual arts?

18   A    From December 2007 up to June 2009.

19   Q    And during this time that you were teaching

20   visual arts for the 2008/2009 School Year, what was

21   your performance evaluation?

22   A    I was given:  Needs improvement.

23   Q    Before 2008 and 2009, had you ever received a

24   negative performance evaluation before in all your

25   years at DCPS?

                                                        84

1    A    Not at all.

2    Q    Was anyone else RIFed at Sharp?

3    A    I'm the only one as far as I know.

4    Q    Do you know how many new teachers were hired at

5    Sharp for this year?

6    A    Before I left in October 2nd on administrative

7    leave, there were six new teachers.

8    Q    Do you have any reason to believe that there was

9    a personal conflict between you and the principal?

10    A    I really feel and believe that for reasons only

11    known by the principal, she did not like me or respect

12    me or appreciate anything I did.

13    Q    I would like to ask you a few more questions

14    about your background.  What is your educational

15    background?

16    A    I am -- I went to the Catholic University where

17    I got my B.S. in Special Education, and then I moved

18    on to Howard University with a Masters in

19    Communication, Mass Communication.  And then I, since

20    then had over the 60 hours of post-graduate work in

21    special education.  And I've also taught for another

22    school system prior to DCPS.

23         I worked with the Embassy in the Diplomatic

24    Corps.  I worked in radio as an announcer for WHUR with

25    Kojo Nnamdi who was my boss.  You probably know about

85

1       Kojo.  I've worked at some other radio stations, and I

2       have been invited to teach from some of my past

3       professors to fill in for them when they are out of the

4       school.  And I have also been invited to speak on

5       different occasions as recently as in August, I was

6       invited to speak in England.

7           Q     When did you begin teaching in DCPS?

8           A     September 17, 1991.

9           Q     What are your areas of certification?

10          A     My certification is in the area of special

11      education and visual impairment, which is what I've

12      been teaching since I came to the school system until

13      2007.

14          Q     Before you came to Sharp, what other positions

15      did you hold within DCPS?

16          A     I've always been a vision teacher.  I'm sorry.

17      Before DCPS?

18          Q     Before Sharp, where else in DCPS?

19          A     I've always been a vision teacher.  I have

20      gone -- I started out at Tyler Elementary School,

21      which is in Capitol Hill.  And from there, I've taught

22      at Wilson Senior High School.  Twice, I've been sent

23      over there.  I've been to Roosevelt.  I've been to

24      Hamilton.  I've been to a private school.  It is on

25      14th and -- please give me one moment.  It will come

                                                              86

1    to me.  Kingsbury Day School.  It's on 14th and

2    Gallatin.

3          I've been at Simon.  I've been at Malcolm X.

4    I've been at Eliot.  I've taught pretty much -- at Bell

5    Multicultural.  I've taught pretty much all around the

6    City.

7    Q    Did you work as an itinerate teacher?

8    A    Yes.

9    Q    I think we've established this, but are you

10   blind yourself?

11   A    If I'm not blind, I should be lying.  I know I'm

12   blind.  I've been blind since I was two years old.

13   Q    Are you completely blind?

14   A    Totally blind.  Certified by my doctor, Dr.

15   Trevor Ropark (sp) in England who also was the

16   instructor to many of my doctors here in the U.S., my

17   eye doctors here, who were his students in England.

18   Q    To your knowledge, are there any other totally

19   blind teachers in DCFS?

20   A    As far as I know, I'm the only one right now.

21   The other one that was there was, again, fired by

22   DCPS.

23   Q    Do you believe that it has made a difference to

24   your students that you are totally blind?

25   A    I think my students -- first of all, I usually

1     let them know -- anywhere I go, I let them know that I

2     am blind.  That there is nothing wrong about being

3     blind.  Life continues after blindness.  But the thing

4     that I let them know the most of all is that they have

5     to contribute to society.  And how do they contribute?

6     Going to school, becoming productive citizens, paying

7     taxes, getting married, becoming useful to themselves

8     in their society.  And that's what I impart in all my

9     children.  I ask them to be positive about their lives

10    and not just sit down.

11         And I always tell them, well, I have a cane and

12    all I need is a cup and a corner, and I refuse to look

13    for a cup and a corner.  And that's what I try to teach

14    to my children.

15    Q    Have you done anything to advocate for blind

16    students in DCPS?

17    A    All the time, and that's where I get into

18    trouble.

19    Q    Could you describe that for us, please?

20    A    You know, there are a lot of people that are

21    administers.  Even with their level of education, they

22    still lack that mere understanding of what it is to be

23    disabled.  Some of them are scared to even touch you,

24    scared to talk to you because they feel it is

25    contagious.

1        I know, for instance, the principal of my

2    school, when she first came in there, she wouldn't even

3    touch the children.  Of course, the children would come

4    with all kinds of problems.  They are multiply disabled

5    and some of them don't talk, some of them cannot move

6    their arms, some of them cry all the time, some of them

7    are too fat, and some of them drool.

8        So she was scared to touch the children, and my

9    colleagues told me -- you know, shared some of that and

10   I kind of would notice her talking to them from a

11   difference.  And that's not love.

12   Q    Do you have reason to believe that you've made a

13   difference for particular students?

14   A    Well, are you talking about in DCPS or even

15   before DCPS?

16   Q    Both, please.

17   A    Well, right now, at the Federal Department of

18   Education, I have a student that I taught back in the

19   '70s.  She's a lawyer making the same salary as I am

20   in that department.  I taught four of them from the

21   same family who were blind.  I have had students here

22   from DCPS that I have taught that went to school.  One

23   of them went to school in Ohio, went to university in

24   Ohio.  Another one graduated from -- I taught this one

25   at Wilson.  He graduated from George Washington

                                                       89

1    University.  Oh, gosh.  They are all over doing

2    different things.  Some of them are working right now.

3       Q     Have you, yourself, questioned whether you would

4    come back to DCPS if you found a position elsewhere

5    and the Union later won your right to be reinstated?

6       A     Well, after hearing what the lawyer -- the

7    question the DCPS lawyer was asking, I'm scared

8    because he said something to the effect that if the

9    teachers come back they may be RIFed again.

10       And so that's not promising.  And if I am going

11    to be dealing with people who are not understanding,

12    don't appreciate you and don't believe that -- in

13    giving you a chance to succeed, then it's hard for

14    anybody to succeed or to want to come back.

15       But I love my children.  I like to give them a

16    chance if the environment and the attitude will change

17    and if underhanded things will not be done by DCPS.

18    Because this is totally underhanded.

19       I function based on trust.  If I go to the bank

20    and I ask the teller to give me $100 in 20-dollar

21    bills, I am expecting to have five bills.  But if they

22    give me one, one-dollar bills, I cannot tell the

23    difference.  They are the same size, shape and color.

24       So DCPS, in essence, is pretty much lying to me

25    and making me want to believe their story.

90

1        MS. ZWACK:   I am going to turn the witness.

2        MR. UTIGER:   I have no questions for this

3   witness.

4        THE COURT:   Thank you, very much.

5        MS. ZWACK:   Your Honor, could we have five

6   minutes?

7        THE COURT:   We just had a break of ten minutes.

8        MS. ZWACK:   I understand.   I have a message from

9   my witness that she ran into some trouble and I just

10  want to make sure that she's going to be here.

11       THE COURT:   You can take a few minutes.

12       Are you asking for a five-minute recess?   Is

13  that what you're asking for?   Because that's fine.

14       MS. ZWACK:   Yes, your Honor, we are just so that

15  we can --

16       THE COURT:   Let's do that.   Another short

17  recess.

18       (Whereupon a recess was taken from 11:49 a.m.

19  until 11:55 a.m.)

20       MS. ZWACK:   Thank you for the recess, your

21  Honor.   The Union calls Gwendolyn Griffin.

22                   *  *  *  *  *

23  Thereupon,

24            **GWENDOLYN GRIFFIN,**

25  having been called as a witness for and on behalf of

91

1    the Plaintiff and having been first duly sworn by the

2    Deputy Clerk, was examined and testified as follows:

3            BY MR. JACKSON:

4        Q    Ms. Griffin, will you identify yourself for the

5        record.

6        A    My name is Gwendolyn Griffin.  I am the D.C.

7        Congress of PTA's president as well as --

8        Q    Who are you employed by?

9        A    Okay.  I am employed by Greater Washington Urban

10       League.  At that job, I do workshops for parents all

11       over the City as well as I work with ex-offenders.  I

12       have a Farthy (sp) initiative program that I run.

13       Q    And what is your connection to the DCPTA?

14       A    I am the newly elected PTA president.  I was

15       elected in May of this year.

16       Q    And what is the DCPTA?

17       A    The DCPTA is a branch off of the National PTA.

18       It's a Parent and Teachers organization.  I always

19       like to say parents, teachers and administrators

20       working together.

21       Q    And who falls under the umbrella of your

22       organization?

23       A    All of the D.C. Public Schools as well as

24       private schools and charter schools.  I have charters

25       over them as PTAs.

                                                          92

1      Q     Approximately how many members are there in the
2    DCPTA?
3      A     We are talking close to, and building, over
4    4,000.
5      Q     Do you have children who have attended or are
6    attending DCPS?
7      A     I have two children of my own that have
8    graduated from DCPTA -- I'm sorry.  D.C. Public
9    Schools.
10            THE COURT:  You never graduate from DCPTA,
11   right?
12            THE WITNESS:  No, ma'am.  No, ma'am.  No, ma'am.
13            But I'm a product of D.C. Public Schools, Class
14   of 1972, McKinley.  I have a son that graduated from
15   Dill, and I got full scholarship for him to go to
16   Murray.  And he is now graduated from the College of
17   Holy Cross.
18            My daughter, on the other extreme, you, as the
19   audience and everyone else call it's mentally retarded.
20   I do not use that term.  My daughter is called in my
21   family, the special one.  So I have been through DCPS
22   with both of my children.
23     Q     And do you have any children who are currently
24   in DCPS?
25     A     Yes, I do.  I have three of my -- well, two of

                                                            93

1    my nephews and one of my niece that are in D.C. Public

2    Schools as we speak.  I have one that's in the 12th

3    grade, one that's in the eighth and one in the first

4    grade.

5        Q    And are your nephews and your niece your wards?

6    Are you their guardian?

7        A    Yes, I am.

8        Q    So how long, in terms of years, have you been

9    involved with DCPS as a parent?

10       A    With DCPS, oh, God, I'm still ongoing.  My son

11   is -- my daughter is 32.  She is the oldest.  So when

12   she came into school, it was Mamie D. Lee when she was

13   entered in, of course, with the Special Ed.  So I've

14   been involved with D.C. Public School, I could say

15   almost 30 years or so; maybe 25, 30.

16       Q    We have been talking about your experience as a

17   parent, but speaking in your capacity as president of

18   the DCPTA, has the DCPTA taken an official position

19   with regard to this RIF?

20            MR. UTIGER:  Objection.  Relevance.

21            THE COURT:  Sustained.

22            BY MS. ZWACK:

23       Q    Beyond the presidents of the local schools, the

24   PTAs, have you had an occasion to communication

25   directly with students and parents about the RIF?

94

1    A    Yes, I have.

2    Q    Have they expressed any concerns to you about

3    how the RIF or how it has been handled?

4         MR. UTIGER:  Objection.  Calls for hearsay.

5         THE COURT:  Sustained.

6         MS. ZWACK:  If I could just respond to the

7    objection.

8         THE COURT:  It's hearsay.  You just asked her

9    what other people told -- you just asked her what other

10   people told her, and she can't testify about what other

11   people told her.

12        MS. ZWACK:  I'm not asking for specific

13   testimony.

14        THE COURT:  Yes, you were because you phrased

15   it -- since you want to be on the record about this,

16   since you phrased your question in terms of whether

17   they had expressed concerns, your question included the

18   content of what it is that they told her, and that is

19   hearsay.

20        BY MS. ZWACK:

21   Q    Is your organization --

22        THE COURT:  You didn't just ask whether they had

23   talked about the RIF, you asked -- your question --

24   your question included the out-of-court statement that

25   you are asking me to rely on.  That's the problem.

                                                        95

1          MS. ZWACK:  I'm not asking that the Court

2     rely --

3          THE COURT:  Yes, you are.

4          MS. ZWACK:  -- upon it for the truth of the

5     matter asserted.

6          THE COURT:  Counsel, the fact -- you asked her a

7     question about the content of the out-of-court

8     statement and that's not admissible.  That's hearsay.

9          If you have a question that's not hearsay, feel

10    free.

11         BY MS. ZWACK:

12    Q    What are some of the general concerns that your

13     organization of parents and students have raised

14     regarding this RIF?

15    A    Quite a bit of concerns.  One is the ability --

16     let me go back.

17         THE COURT:  If you would just answer the

18    question.

19         MR. UTIGER:  Your Honor, I'm going to object to

20    the form of the question.

21         THE COURT:  I'm going to allow this one.  I'm

22    not sure it's relevant, but I'm going to allow this

23    one.

24         THE WITNESS:  Could you repeat that question,

25    please?

96

1        BY MS. ZWACK:

2    Q    Yes.  I asked you to speak to some of the

3    concerns that parents and students in your

4    organization have raised --

5        THE COURT:  No, that wasn't the question.  The

6    concern was the questions that was -- it was questions

7    the organization had raised.

8        MS. ZWACK:  The organization has raised.  I

9    misspoke.

10       THE COURT:  Since she's president of the

11   organization, I'll allow her to testify about the

12   organization's concerns.

13       THE WITNESS:  Our concerns as the DCPTA?

14       THE COURT:  Uh-huh.

15       THE WITNESS:  Okay.  Our concerns were how the

16   RIF were done and how they were handled.  Another one

17   is that parents have asked me about the process of --

18   not so much the process, but what's going to happen to

19   the students that they have in the schools.  And what I

20   mean by that, we have a number of complaints of how one

21   school has only one counselor, another school only has

22   two counselors, and how it's going to affect their

23   students.

24       I wasn't so concerned about the parents because

25   parents were in my front room on that Saturday morning.

97

```
1    I was more concerned of the children that they had
2    brought to me to talk to me about what had happened at
3    various schools all over the City.  One was how
4    counselors, they are going to be -- they are trying to
5    figure out how a counselor can be effective if it's one
6    counselor at a school and they have -- and especially
7    our seniors.  They are really concerned about trying to
8    get into college and so forth.
9         MR. UTIGER:  Your Honor, non-responsive.  The
10   question was:  What has the organization raised as
11   concern.
12        THE WITNESS:  Okay.  The organization's concerns
13   is how the RIF was done, because we were not, as
14   parents, included in the process.  I had parents that
15   were sitting at meetings with other parents all over
16   the City and they was telling them how they were apart
17   of the decision on getting rid of certain people at
18   that -- at the school, where other parents was saying
19   how did this happen; we were not asked at all to even
20   be considered or even be apart of the decision making.
21        BY MS. ZWACK:
22   Q    Does the agency take the position that this RIF
23   has impacted students?
24   A    Yes, it has.
25   Q    In what ways?
```

98

```
1       A      What I had to do was --

2            MR. UTIGER:   Your Honor, I'm going to object on

3       foundation grounds.   I think we keep sliding into the

4       witness' opinion and what she has heard.   If the

5       organization has submitted some document or it has made

6       some public statement as an organization --

7            THE WITNESS:   Yes, we have.

8            MR. UTIGER:   -- she can talk to that.

9            MS. ZWACK:   May I lay a foundation, then?

10           THE COURT:   Yes.

11           THE WITNESS:   Yes, we have.

12           BY MS. ZWACK:

13      Q      Are you speaking from your personal belief or do

14      you speak on behalf of the organization?

15      A      When I put on my hat for DCPTA, I have to speak

16      on what my members tell me to speak about.   I had to

17      go to my members and ask them what stand do you want

18      to take with the Teachers, and everyone that I went

19      to, I had to call -- well, first of all, I went to my

20      board members because I have to start with them.   I

21      went to my board members and asked my board members

22      what stand do you want to take.   They said that they

23      wanted to take the stand with the teachers.

24           THE COURT:   I don't think that's -- I don't

25      think this is relevant, Counsel, frankly.   I appreciate
```

99

1      it.

2              MS. ZWACK:   Ms. Griffin's testimony goes to the

3      public interest.   DCPS has put on the assertion that

4      this RIF had little or no impact on the students, and I

5      would like --

6              THE COURT:   But their position about it isn't

7      really relevant.   The issue is the impact.

8              MS. ZWACK:   That's what I've just asked her.

9              THE COURT:   She can testify of her knowledge of

10     the impact.

11             MS. ZWACK:   Okay.

12             THE WITNESS:   The impact, is that what you want

13     me to --

14             BY MS. ZWACK:

15     Q    The question is if you could testify about your

16     knowledge of the impact of the RIF on students.

17     A    I have spoken to some of the students over the

18     City and they have clearly stated that they are having

19     problems.   I spoke to one last night, because I wanted

20     to get a clear understanding from him.   And he said

21     that on the surface --

22             MR. UTIGER:   Your Honor, this is hearsay.

23             THE COURT:   This is hearsay.

24             THE WITNESS:   From my standpoint of this --

25             BY MS. ZWACK:

                                                              100

1    Q    Do you have any personal knowledge of how

2    students have been impacted?

3    A    Yes.  Because I am a parent of, well, a 12th

4    grader that this actually happened with.

5    Q    At what school is your son?

6    A    Coolidge.

7    Q    What was your experience?

8    A    Well, my nephew came home kind of discouraged

9    about trying to get his transcript.  Just this past

10   week, he was going with Shiloh Baptist Church to

11   various schools, five of them across the Midwest --

12   not the Midwest -- the midpart of the United States.

13   I am talking about, let me say, Old Dominion, Duke,

14   and he wanted to take his transcript.

15        For two weeks, he went to this counselor and

16   asked the counselor.  Now, at this school you have two

17   counselors.  Okay.  And he begged her that he needed

18   that transcript.  With that, he couldn't get it.  She

19   told him that he had to come back and step up an

20   appointment.  And he said that I can't set up an

21   appointment at this time because I only have two

22   classes.

23        So she said, well, your appointment is going to

24   have to be at 4:00.  So that means that he has to come

25   home because he can't stay at the school, and then go

                                                      101

1    back.  So he was getting frustrated.  So what I decided

2    to do was go up and see if I could get the transcript.

3    Had a little problem.  Had to sit and wait, but I

4    finally did receive the transcript for him.

5            So I made the decision then, when I went there,

6    okay, that this is a problem here.  You have 700

7    students, two counselors, one seasoned, one is not.  So

8    what do I do?  Let him go and keep on trying to get his

9    things or go and seek other help?  I seeked other help.

10   What I mean by that, I went out of the D.C. Public

11   Schools and got someone from my office.  We have a

12   post-secondary counselor at Greater Washington Urban

13   League.  So I gave her the transcript and told her to

14   please help my nephew get into the colleges that he

15   wanted.  There were deadlines that he was missing, so I

16   asked her to help if she should.

17   Q    Do you have any knowledge of whether these type

18   of services are widely available to other parents?

19   A    I'm sure they are, but all parents don't know

20   how to reach out and find various organizations and

21   things.  They just rely on the counselors or even

22   teachers at the school that could help them.

23   Q    Sort of generally speaking, DCPS has taken the

24   position that it would be more disruptive to reinstate

25   the RIF teachers and put them back in the classroom.

                                                          102

1      Does the DCPTA take any position on this?

2      A    We disagree.  We feel that if those Teachers, as

3  well as the counselor, were put back into place, that

4  it would help calm down the students and come with

5  more of an agreement.  I'm hearing that -- well,

6  that's hearsay.

7           All across the City, okay, parents are saying

8  that if we could get some of those counselors back as

9  well as some of the teachers that were helping students

10  get into college and various things, you know, it was a

11  bond.  We are into six weeks of school.  It was a bond

12  there that was lost, and now you have lost the kids.

13      Q    To be clear, is this your personal position or

14  is this the position of your organization?

15      A    No.  This is the position of the organization.

16          MS. ZWACK:  I'll pass the witness.

17          THE COURT:  And you, too, I take it?

18          THE WITNESS:  Well, I had to vote, so, yes,

19  ma'am, mine too.

20          MS. ZWACK:  Pass the witness.

21          MR. UTIGER:  No questions, your Honor.

22          THE COURT:  Thank you, very much.

23          Anything else from the Union?

24          MS. ZWACK:  We have no other witnesses, your

25  Honor, at this time.

1          THE COURT:  Does the City have any witnesses?

2          MR. UTIGER:  Your Honor, our only concern is the

3     Court had some questions about the declaration.  We

4     think --

5          THE COURT:  I do have some questions.  I mean,

6     there have been some issues raised about whether there

7     really was a budget shortfall.

8          MR. UTIGER:  Then, your Honor, we would like to

9     put on a witness on that issue.

10         THE COURT:  Okay.  Is the witness here?

11         MR. UTIGER:  Yes, your Honor.  If we could have

12    a five-minute recess just to prepare.

13         THE COURT:  Okay.  Here's the concern:  I think

14    I told you, I have a meeting in -- okay.  How long do

15    you think the witness will be?

16         MR. UTIGER:  Half an hour at most.

17         THE COURT:  Okay.  That's fine.  We might need

18    cross later, but you need a couple of minutes.  That's

19    okay.

20         MR. UTIGER:  Thank you, your Honor.

21         THE COURT:  If I'm giving a break to one, I have

22    to give a break to the others.

23              (Whereupon a recess was taken from 12:11 p.m.

24    until 12:19 p.m.)

25         THE COURT:  Anything from the Government?

1      MR. UTIGER:  Your Honor, we call Lisa M. Ruda to
2  the stand, please.
3      MR. JACKSON:  Your Honor, before the witness
4  takes the stand, I feel I have to make an objection to
5  the presentation of this witness.  We were never
6  given --
7      THE COURT:  I didn't say that you had to.  I
8  don't think there was a requirement.  The issue was
9  whether they were going to be witnesses at all, and
10  D.C. said maybe one.  And you made that proffer, but I
11  don't think there was a requirement that -- and there's
12  no requirement in the rebuttal case that they list a
13  witness.
14      MR. JACKSON:  Your Honor, we exchanged -- we
15  were asked to give a list of witnesses, and we did that
16  last Friday, to DCPS.  At that point in time, we talked
17  about the declarations that were appended to the
18  preliminary injunction papers.
19      THE COURT:  Last Friday?  You mean, last...
20      MR. JACKSON:  Friday of last week.
21      THE COURT:  The two of you?
22      MR. JACKSON:  The two of us, Mr. Utiger and
23  myself.  I gave him a verbal list of our witnesses.  On
24  Tuesday we gave him a written list.  He never informed
25  us that he was presenting any witness at all.

                                                    105

```
 1          THE COURT:  Well, I don't know that he intended
 2     to.
 3          MR. UTIGER:  And I did not until today, and
 4     basically it's because of The Court's question.  But
 5     let me correct the record, slightly.  I received the
 6     proffer of what these witnesses were going to say when
 7     the Plaintiffs filed it yesterday with The Court.
 8          MR. JACKSON:  Not true.  He received the proffer
 9     on Friday of last week.  When he called me, I called
10     him back and left a message with the names of the
11     witnesses and with the statements of what they would
12     testify about.
13          MR. UTIGER:  Your Honor, I don't know how far
14     you want to go into this.
15          THE COURT:  I don't want to go into this at all,
16     but I accept that the Plaintiffs notified the District
17     of who they were going to call, and -- and I also
18     understand that from our conference last week, that the
19     District, I think, was not attending to call a witness.
20          The District made certain representations this
21     morning, in response to my questions, regarding the
22     affidavit that was submitted, and -- and the Plaintiffs
23     objected to those based on there simply being --
24     effectively being proffers.  And the District, in
25     rebuttal, has determined to call a witness, based on
```

106

1    the testimony that has been presented.  And given the

2    nature of the equitable relief that's requested and how

3    significant it is, I'm going to let them do it.  Go

4    ahead.

5        I take it there is no additional witness the

6    Plaintiff was going to call, at this juncture, that the

7    Plaintiff hasn't called.

8        MR. JACKSON:  No, Your Honor.  We have finished

9    with the presentation of our witnesses.

10       THE COURT:  Okay.  So you've been able to call

11   all the witnesses who you wanted to.  I mean, the

12   question I had initially was whether you needed that.

13       MR. JACKSON:  There's no doubt about that.  That

14   wasn't my point.

15       THE COURT:  Okay.  Well, and they're certainly

16   allowed to change their strategy if it turns out that

17   maybe they need a witness after all.

18                    *  *  *  *  *

19   Thereupon,

20                  **LISA MARIE RUDA,**

21   having been called as a witness for and on behalf of

22   the District and having been first duly sworn by the

23   Deputy Clerk, was examined and testified as follows:

24                 **DIRECT EXAMINATION**

25       BY MR. UTIGER:

                                                    107

1      Q      Can you please state your name for the record?

2      A      Yes.  My name is Lisa Marie Ruda.  It's R-U-D-A.

3      Q      And what is your current position?

4      A      I'm the Chief of Staff for the District of

5      Columbia Public Schools.

6      Q      And can you tell us a little bit about your

7      background and education?

8      A      I have been with the District of Columbia Public

9      Schools as their chief of staff since July 2007.  In

10     that capacity, I'm responsible for coordination and

11     alignment of all departments and divisions to ensure

12     that we're moving in the right direction, and probably

13     more importantly, in the same direction.  As part of

14     that work, I am directly responsible for the opening

15     of schools.

16             Prior to coming to the D.C. Public Schools, I

17     served as the general counsel, the chief of staff and

18     the interim CEO's chief executive officer for the

19     Cleveland Public Schools, an urban school district with

20     over 70,000 students and 130 school buildings.

21             In that capacity as chief of staff, which I

22     served for, collectively it was about nine years, chief

23     of staff for, I think, seven years of that period, I

24     was also responsible for school opening and ensuring

25     that all schools opened on time with the supplies, the

                                                          108

1    personnel, and all that they needed to begin teaching

2    and learning on the first day of school.

3        Q    Are you familiar with the timeline for the

4    establishment of the DCPS budget for the 2009-2010

5    School Year?

6        A    Yes.

7        Q    Can you tell us what you know about how that

8    budget developed?

9        A    Yes.  We begin preparation for school opening

10   the December prior to when school actually opens in

11   August.  Part of that work that we begin in December,

12   we set enrollment projections, and then early into the

13   school year, into the calendar year in January and

14   February, the schools develop their school-based

15   budgets.

16         Through that budget-development process, they

17   identify the staff members that they need.  Those

18   individual school budgets are rolled up into --

19         THE COURT:  You mean positions they need?

20         THE WITNESS:  Yes.

21         THE COURT:  Not individuals?

22         THE WITNESS:  No, no.  Just positions.

23   Absolutely.  I apologize, your Honor.

24         Those school budgets are then rolled up into the

25   DCPS budget, which is submitted as part of the Mayor's

109

1    budget submission for all City agencies, DCPS being one

2    of those agencies.  Those budgets, that first budget

3    was submitted by the Mayor to City Council in March of

4    2009.  That budget totaled $562 million and included

5    funding to support the positions we would need for the

6    upcoming school year.

7           In early April, I believe it was April 9th,

8    2009, the chancellor appeared before City Council, at

9    which the City Council held a public hearing

10   specifically related to the Mayor's proposed FY-10

11   budget for DCPS, again the budget that had been

12   submitted as part of the March 20th submission.

13          THE COURT:  So that's the 562 million?

14          THE WITNESS:  Yes, ma'am.

15          On May 12th, Council made the decision to set

16   aside $27 million from the DCPS budget.  And when I say

17   "set aside," they did that literally while we watched

18   it on TV, and they did it through what was called the

19   "First Reading of the Budget Support Act."  Basically,

20   Council questioned whether we would have 3,000 students

21   that we had claimed we would have in the March

22   submission.  And as a result on first read, they set

23   aside $27 million.

24          That same day, as we watched it unfold on TV,

25   the chancellor drafted a letter to the City Council

                                                         110

1    chair as well as to members of the Council.  That's the

2    letter that I believe Your Honor referred to earlier

3    that referenced the 338 teachers.

4          If I could explain for a second, sir.  Council's

5    basis for setting aside the $27 million, as I watched

6    it on television, was that they did not believe we

7    would have 3,000 students.

8          MR. JACKSON:  Your Honor, I'm going to object to

9    the witness testifying about what other people, not

10   witnesses in court.

11         THE COURT:  I am going to allow her to testify

12   about the District's response to the issues that were

13   raised as a matter of public record by the City

14   Council.

15         So your objection is overruled.  Thank you very

16   much.

17         THE WITNESS:  As a result, the 338 teacher

18   figure was purely that it was based on teachers alone.

19   Because the issue was whether student enrollment would

20   actually materialize.  Where that reduction would have

21   to be felt would at the classroom level because the

22   assumption was you did not have the students, you

23   wouldn't have the teacher.  That was May 12th.  I,

24   then, attended a meeting after --

25         THE COURT:  And that's the letter that's

                                                    111

1    attached to Chancellor Rhee's declaration, her

2    affidavit?

3          THE WITNESS:  No, ma'am.  I am getting to that

4    letter.  That was what --

5          THE COURT:  Well, it's May 12th.

6          THE WITNESS:  Yeah.  So May 12th we see the

7    first read of the Budget Support Act, $27 million is

8    set aside.  After much public conversation, discussion

9    and debate, I attended a meeting on Friday, May 29th

10   with the Chancellor, members of the Charter school

11   board and the chair.

12         THE COURT:  The chair of the Council?

13         THE WITNESS:  Yes, yes.  The City Council chair.

14         After that meeting, both the Chancellor and the

15   chair agreed that $24 million of the 27, that had been

16   set aside on May 12th, would be returned to DCPS.

17         Your Honor, that is the letter dated June 1st

18   that's attached to the Chancellor's declaration that

19   reflects that agreement.  That was Part 1 of the

20   agreement.

21         Part 2 of the agreement was:  The $3 million

22   difference, from the 27 to the 24, would be set aside

23   for future educational purposes in the event that the

24   DCPS enrollment exceeded 44,681 students.  So the

25   Council was holding a little bit back.  Okay?  That's

                                                         112

1    reflected in the June 1st letter.  That's Monday,

2    June 1st.

3         Tuesday, June 2nd, Council then publicly adopts

4    the $568 million budget, the core of which reflects the

5    agreement that the chancellor and the chair had reached

6    the day before on June 1.  That budget was passed by

7    City Council.  By that point in the game, that is the

8    budget upon which we are in full force hiring for the

9    new school year, the 568.  And again, it reflects the

10   written agreement the Chancellor and the Chair reached

11   the day before.

12        Later that month, the Citywide CFO, announces

13   that the District is facing -- District Government is

14   facing additional budget pressures.  The Mayor is then

15   forced to resubmit another budget on June 17th.

16   However, what the Mayor submits on June 17th reflects

17   what had been agreed to with the chair on June 2nd, the

18   568.  So by the time the Mayor resubmits, there is

19   absolutely no belief on our part that there will be any

20   further reduction to the DCPS budget.

21        And that is our belief until Friday, July 31st

22   when council ultimately made the decision to reduce and

23   approve the final DCPS budget of 550 million.  That was

24   Friday, July 31st.  At that point in the game, Your

25   Honor, if I haven't completed my hiring for school

                                                      113

1    opening, I've got serious problems for the new school.

2    I can't --

3          THE COURT:  School opened when, August 17th?

4          THE WITNESS:  School opened August 24th, but the

5    first day for new teachers to report is, I want to say,

6    it's August 13th or 14th, because new teachers new to

7    the system have some extra days to get acclimated.

8    Monday, August 17th, your Honor, is the first week of

9    professional development for all teachers.

10         And quite candidly, your Honor, by the time I

11   get to the following Tuesday, I've got all but about 20

12   positions filled.  So, I believe, you asked earlier:

13   Were the vast majority hired?  Yes, absolutely.  And to

14   put that in context, when I opened school on Day 1,

15   August 24th, I had 28 vacancies.

16         It never really hit a point, unfortunately,

17   where we have zero; there's just so much movement at

18   times.  So the vast majority of teachers had been hired

19   by that point.

20         BY MR. UTIGER:

21    Q    There has been some questions about $3 million

22   that is a cost for -- the cost of a RIF?

23    A    Uh-huh.

24    Q    Can you speak to that?

25         MR. JACKSON:  I object to the question.  I don't

114

```
 1    think there is anything in the record that says that

 2    $3 million was --

 3             THE COURT:  Actually, there was testimony this

 4    morning about a budget which included $3 million

 5    projected for severance.

 6             MR. JACKSON:  Severance pay --

 7             THE COURT:  Right.

 8             MR. JACKSON:  Not the cost of the RIF as stated

 9    by counsel.

10             THE COURT:  Okay.  I understood -- I thought --

11    I understood this was a question related.  Why don't

12    you rephrase it.

13             MR. UTIGER:  I'll rephrase that.  That was my

14    intent and I'll rephrase it.

15             MR. JACKSON:  Let's retract the record.  It was

16    severance pay.

17             THE COURT:  Why don't you rephrase the question

18    so there's no confusion.

19             MR. UTIGER:  I will, your Honor.

20             BY MR. UTIGER:

21     Q    Can you speak to the reasons why $3 million

22    appeared as severance pay in the budget?

23     A    In my experience --

24             THE COURT:  Which budget was it in, first of

25    all?  Where does that show up?
```

115

```
 1            THE WITNESS:  The $3 millions --
 2            THE COURT:  Right.
 3            THE WITNESS:  -- for the costs related to
 4       severance, Your Honor?
 5            THE COURT:  For RIF severance.
 6            THE WITNESS:  For RIF severance, it doesn't
 7       appear in any budget.  Once we've made the decision in
 8       August that we were going to need to lay off staff, I
 9       know from my prior experience, unfortunately having to
10       do larger RIFs, it actually costs money to let people
11       go.  So that was an estimated spend pressure that was
12       put into --
13            THE COURT:  What is that -- Where does that
14       first appear?  If she said that -- I mean, Ms. Collins
15       testified about it, and I wasn't quite sure.  There was
16       reference to 44 million, 7 million excess, 3 million
17       RIF-related severance.  Do you know what that is?
18            THE WITNESS:  Your Honor, I don't know where
19       Ms. Collins received that information.  We hadn't made
20       any decision to do a RIF, a Reduction in Force, prior
21       to July 31st.  That wasn't even on the table.  But once
22       the decision was made that we would need to be doing a
23       RIF, it was only prudent to estimate some anticipated
24       projected.  It was not actual cost of what the
25       severance payout would essentially be.
```

                                                          116

1       THE COURT:  And how did you do that?

2       THE WITNESS:  Our CFO calculated, just did a --

3   basically an estimate of if we lost approximately 300

4   staff members.  And I believe they estimated the

5   average experience in the five to ten-year range.  It

6   was an estimation at that point because we had not

7   identified individuals who would actually be separated

8   until the end of September.  It just would not have

9   been possible, ma'am.

10      BY MR. UTIGER:

11   Q    If DCPS had to put the teachers that were RIFed

12   back onto the rolls and could not conduct another RIF

13   to remove other teachers, what impact would that have

14   on DCPS' budget?

15      MR. JACKSON:  Your Honor --

16      THE WITNESS:  Because --

17      THE COURT:  No.  I'm going to let her answer the

18   question, and you can follow up on cross if you want

19   to.

20      MR. JACKSON:  Okay.

21      MR. UTIGER:  I will withdraw it and I'll

22   rephrase.

23      BY MR. UTIGER:

24   Q    What would DCPS have to do to absorb the

25   additional costs if required to put the RIF teachers

117

1    back on the roll?

2         THE COURT:  In other words, not that they

3    couldn't do another RIF, but just what would be the

4    impact on the budget if you had to put them back on the

5    rolls?

6         THE WITNESS:  I would immediately have

7    another --

8         MR. JACKSON:  Your Honor, I have an objection to

9    Mr. Utiger's question.  Is the witness answering his

10   question or your question?

11        THE COURT:  I thought it was the same question.

12        MR. JACKSON:  It wasn't.  It was not the same

13   question.

14        MR. UTIGER:  I'll yield to the Judge's question.

15        THE COURT:  Then, answer mine.

16        Are you objecting to mine, or are you objecting

17   to his?

18        MR. JACKSON:  Of course not, your Honor.

19        THE COURT:  You can.

20        MR. JACKSON:  I would never object to your

21   question; not this one, Your Honor.

22        THE COURT:  Not this one.

23        THE WITNESS:  Ma'am, we would immediately have

24   another budget pressure which, if not resolved, would

25   be in violation of the anti-deficiency statute, which

                                                        118

1    is clearly not even an option.  So I would have to look

2    at another larger number, particularly if I couldn't

3    separate WTU members, I would have to go to another

4    employee group, presumably they may have a lower

5    average salary, which would require me to let more

6    people go, and then we're also another month into the

7    fiscal year, so even more folks would go.

8         THE COURT:  In other words, you're saying if

9    these people were required to be put back on the rolls,

10   you would have to lay off other people?

11        THE WITNESS:  Absolutely.  I'm not sure how I

12   would do that other than -- I mean, personnel is so

13   much of our budget, and it would be more individuals.

14        MR. UTIGER:  Your Honor, I have no further

15   questions unless the Court shall ask questions about

16   the Rhee declaration.

17        THE COURT:  I have one question that maybe you

18   can explain.  There's been some reference to excess

19   teachers, and -- and there's -- in the affidavit of

20   Michelle Rhee, it says that there were excess teachers

21   and that most of them get absorbed by the central

22   office budget, but then they couldn't anymore.

23        Can you explain the difference -- what -- I take

24   it an excess teacher is a teacher who still has a job?

25        THE WITNESS:  If I may, your Honor, because

                                                        119

1    excess -- what I learned coming from Cleveland, is

2    excess is a term of art in the WTU contract.  Excess

3    means that at the end of a given school year in D.C.,

4    that a teacher no longer has a placement at the school

5    where they were assigned for the school year that just

6    wrapped up.

7            THE COURT:  And why would that happen?

8            THE WITNESS:  It could happen for a number of

9    reasons.  Under No Child Left Behind, some schools have

10   the opportunity to restructure themselves, where some

11   staff members leave, some come back.  You may have saw

12   last year, Your Honor, we closed a number of schools.

13   So if a person had a position, they had a job at that

14   school, that school is no longer open.  Grade

15   configuration changes.  The school may have been a

16   Pre-K --

17           THE COURT:  For example, when a school used to

18   go up to sixth grade, and then it only goes up to fifth

19   grade, you've got extra teachers?

20           THE WITNESS:  Yes.  Exactly.  You've go it, Your

21   Honor.  So those individuals have employment with the

22   District of Columbia Public Schools.  They need to find

23   a new school assignment, and that's through our WTU

24   contract.  We run the hiring season really from the

25   middle of April to the middle of July to afford those

                                                        120

1    individuals an opportunity to find placement.

2          Not to minimize the excessing process, but last

3    year -- last year, we had over 1200 excess teachers.

4    At the end of the current school year, we had about

5    400.  Last year, when we had 1200, all but, I want to

6    say, your Honor, it was like 65 teachers, found

7    placements at other schools.  And we adjusted the

8    central budget and we kept the 65 employed by us and

9    assigned them to other schools.

10          So this year, when the Chancellor saw that we

11    had 400, one, it was a marked reduction from the past

12    year, and the expectation was those folks would find

13    placements.  All but 160 did.  And when we realized 160

14    did not have placements, the Chancellor said, we're

15    going to cut the central budget and that was

16    mid-July -- end of July -- to support those teachers.

17          The other thing we know, your Honor, is quite

18    candidly, folks who don't have placements in July,

19    there's a real opportunity they're going to find

20    placements in August because, quite candidly, some

21    teachers -- you know, we believe they're coming back,

22    they don't.  People also just have changes in life

23    where they think they're coming back, their spouse gets

24    a job someplace else.  So that number is always going

25    to dwindle.

1           THE COURT:  Then, I take it, all of those 400,

2    including the ones who found other placements, and the

3    ones who were -- who didn't, were potentially RIF-able?

4           THE WITNESS:  Yes.

5           THE COURT:  Did any of them get RIF'd?

6           THE WITNESS:  I believe it was about 50/50.  Of

7    the folks who were placed, I believe half of them -- a

8    little more than half are still with us, a little less

9    were RIFed.  We try to make it crystal clear to

10   principals that everybody entered the process on equal

11   footing.  So whether their position was supported by a

12   central reduction --

13           (Audience interruption.)

14           THE COURT:  The people who were shushing were

15   right.

16           THE WITNESS:  -- the folks were treated equally

17   in the process.

18           THE COURT:  But some of them may have been in

19   positions where the positions -- that the principal

20   decided to eliminate?

21           THE WITNESS:  Yes.  But the decision to

22   eliminate a position was a separate step from the

23   person who was identified to be separated.

24           THE COURT:  Well, that's actually one of the

25   things I have a question about.  Because that's going

                                                        122

1   to the -- to the mechanics of the RIF, which is not the

2   issue here.  But, if there's only one person in the

3   position, then there really isn't much question about

4   it, is there?

5        THE WITNESS:  Ma'am, I would suggest that the

6   first --

7        THE COURT:  I don't know how often that happens,

8   but...

9        THE WITNESS:  And it did happen in some

10  situations.  But the first piece we asked and directed

11  our principals to focus on and why we said we wanted to

12  make it a clear two-step process, is first, you

13  identify the position that you want to eliminate.  That

14  has to be Step 1.

15       And it's part of a separate process, we identify

16  which people, of all those who hold that position,

17  should separate.  But the position that you -- that you

18  decide, we kind of tied it to, Your Honor, as I said

19  earlier, in February and January we said to schools:

20  Identify the positions you want to build your budget.

21       And in schools, they make decisions.  They said,

22  hey, you know, our reading scores are very low --

23       THE REPORTER:  I'm sorry.  If you could slow

24  down, please.

25       THE WITNESS:  I'm sorry, ma'am.

123

1          Our reading scores are very low, so we want to
2     have an additional reading resource teacher as opposed
3     to a custodian.  Not saying that one is more important,
4     but that school's particular need.
5          So we used the same process in the fall when it
6     came time to identify what positions we were going to
7     eliminate.  And in some cases, schools made the
8     decisions to say, hey, we're going to lose a position
9     outside of the classroom as opposed to a classroom
10    position.
11         THE COURT:  But I take it that the way it works
12    -- and, again, I think this is beyond the scope of
13    where you are, but I take it that the way it works is,
14    that once the position is identified, then do you only
15    look at the people who were in that position?
16         THE WITNESS:  Yes, ma'am.  The way the process
17    is set up, is once the position or the competitive
18    level is identified.  So we identify custodian
19    position.  Then all of the custodians are weighted and
20    ranked who occupy that position.  And then the --
21         THE COURT:  You get some credit for years of
22    service and whether or not you're a veteran and whether
23    or not you live in D.C.?
24         THE WITNESS:  Absolutely.  It's called
25    creditable service.  We're required to include it and

                                                        124

1    we did include it, ma'am.

2           THE COURT:  Thank you.  So in other words, the

3    excess teacher -- that has nothing to do with this?

4           THE WITNESS:  No, ma'am.

5           THE COURT:  That's really what I'm trying to

6    understand.

7           THE WITNESS:  Yes, ma'am.

8           THE COURT:  But the money for the excess teacher

9    was the money in the central office budget that was

10   going to go to paying for the excess teachers who

11   didn't find placements to go wherever they got put?

12          THE WITNESS:  Yes.  And that's before Council

13   cuts the budget.  On July 31st that decision was made,

14   ma'am.

15          THE COURT:  I see.

16          MR. UTIGER:  I have no further questions, Your

17   Honor.

18          THE COURT:  Any questions?

19          MR. JACKSON:  Could I have just a minute, your

20   Honor?

21          (Pause in proceeding.)

22          THE COURT:  Mr. Jackson?

23                    **CROSS-EXAMINATION**

24   BY MR. JACKSON:

25   Q    How long did you say you have been employed by

                                                    125

1      DCPS?

2      A     Just over two years.

3      Q     And do you live in D.C.?

4      A     Yes.

5      Q     Was a RIF the only way to address what you say

6      was a budget shortfall?

7            MR. UTIGER:  Objection.  Relevance.

8            THE COURT:  Well, I am going to let her answer

9      it even though I think that's -- we can talk about it

10     later about whether that's relevant at all.

11           MR. UTIGER:  And just so the record is clear,

12     also it's beyond the scope of direct.

13           THE COURT:  I will allow it, Counsel.

14           THE WITNESS:  The Chancellor considered a number

15     of options, but with the size of the pressure we were

16     facing, there was no viable option that did not include

17     some reduction in staff.

18           BY MR. JACKSON:

19     Q     That didn't answer my question.  My question is

20     very specific.  Was a RIF, the form of reduction that

21     you used, was a RIF the only way to address the

22     shortfall?  Was it or was it not?

23           MR. UTIGER:  Same objection, your Honor.

24           THE COURT:  At this point, I think the question

25     has been answered.

                                                         126

1          MR. JACKSON:  Your Honor --

2          THE COURT:  I disagree with you, Mr. Jackson.

3     She answered the question.

4          MR. JACKSON:  Respectfully, Your Honor --

5          THE COURT:  Counsel, move on.

6          MR. JACKSON:  May I take exception to the

7     ruling, Your Honor?

8          THE COURT:  Yes.  Absolutely.  She testified

9     that --

10         MR. JACKSON:  May I state for the record --

11         THE COURT:  Let me just be clear, Mr. Jackson,

12    that she testified that they considered a number of

13    options, and the RIF was -- that -- that with the

14    pressures they were facing, some RIF was necessary.

15    But let me also make it clear that the issue before me

16    is not whether or not the Chancellor was correct in

17    choosing to RIF versus choosing to not cut the grass

18    for a year -- if that's something that's even within

19    the DCPS budget, which I have no idea if it is or

20    not -- or choosing not to buy any paper or pencils.

21         The issue is, did she -- her decision about how

22    she chooses to allocate the school system's resources

23    is not something The Court is in a position to review.

24         MR. JACKSON:  I agree with that, Your Honor,

25    but --

127

```
 1            THE COURT:  Okay.  I don't want to argue.  This
 2    isn't the time for argument.
 3            MR. JACKSON:  May I -- may I --
 4            THE COURT:  But the point is:  Whether or not
 5    they considered other options, and whether the other
 6    options -- whether you think the other options would
 7    have been better or not, doesn't affect the issues in
 8    this case.
 9            MR. JACKSON:  Your Honor, my question was not
10    whether they considered other options.
11            THE COURT:  Your question was whether a RIF
12    was the only way --
13            MR. JACKSON:  I made no statement about whether
14    I thought one option was better than another.
15            THE COURT:  All right.
16            MR. JACKSON:  The point is, your Honor, just so
17    I can explain the question, is that we have taken the
18    position that the RIF was actually a mass discharge,
19    and so the --
20            THE COURT:  I know you have.
21            MR. JACKSON:  -- the relevance of the question,
22    with respect to our position, is that if there are --
23            THE COURT:  Your question was, was a RIF the
24    only way to address a budget shortfall.
25            MR. JACKSON:  Exactly.
```

1          THE COURT:   And her answer was:   This kind of a

2     budget shortfall required some RIF.   If you want to

3     follow up on that answer, feel free.

4          BY MR. JACKSON:

5     Q    How many management employees were impacted by

6     the RIF?

7     A    I don't know.

8     Q    Were any management employees impacted by the

9     RIF?

10    A    Yes.   Some schools lost assistant principals,

11    other administrative positions.   And in addition, the

12    central office reductions I mentioned earlier were on

13    a department-by-department basis, so individual

14    departments may have let staff members go.

15    Q    Okay.   Do you have any idea how many management

16    employees were impacted by the RIF?

17    A    I don't know.

18    Q    Is there any documentation within DCPS which

19    would indicate how many management employees were

20    impacted by the RIF?

21    A    Yes.

22    Q    What is that?

23    A    The individual reduction sheets that individual

24    schools completed.

25    Q    Would you agree with me that if the reduction

                                                      129

1    occurred by separating the 934 new teachers that were

2    hired for the '09-2010 School Year, that would not

3    require a payment of severance pay to those people?

4        MR. UTIGER:  I am going object to the

5    hypothetical.

6        THE COURT:  I will allow her to answer it.

7        THE WITNESS:  I'm not sure how the severance is

8    calculated if you are here a month, are you entitled to

9    some portion of severance.  I don't know that, Number

10    1.  And Number 2 is I know we called them the new 934

11    teachers.  They were new to D.C., but a number of them,

12    I think almost half, came in at Step 5, which is like

13    five years of experience or more.  I don't know what

14    the severance calculation for that is, sir.

15        BY MR. JACKSON:

16    Q    So is it your testimony that you do not know how

17    severance in DCPS is calculated?

18    A    No, that's not my testimony.

19    Q    Could you state for the record what is it you

20    know about how severance is calculated in DCPS?

21        THE COURT:  Counsel, this not a deposition.

22        MR. JACKSON:  Yes, your Honor, I understand that

23    it's not, but the issue of severance was raised by

24    DCPS.

25        THE COURT:  No.  The issue of severance was

130

1    actually raised by you.

2          MR. JACKSON:  The witness testified about

3    severance on direct examination.

4          THE COURT:  She did.  She did.  And -- she did.

5          MR. UTIGER:  She did not testify that she --

6          THE COURT:  She didn't testify that she was an

7    expert in calculating severance or that she --

8          MR. JACKSON:  I didn't ask her that, your Honor.

9          THE COURT:  Yeah, you did.

10         MR. JACKSON:  I asked her whether she could

11   explain to me --

12         THE COURT:  You asked her whether if you didn't

13   -- if they separated all the new teachers who were

14   hired over the summer, would there be a severance

15   requirement.  And she said she wasn't sure.

16         BY MR. JACKSON:

17   Q    Let me ask this question:  How long does a

18   teacher have to be employed within DCPS to have a

19   right to severance if they are separated?

20   A    I don't know.

21   Q    Okay.  How many of the 934 new teachers, hired

22   for the '09-2010 School Year, were separated in the

23   RIF?

24   A    I want to say it was about 20 percent.

25   Q    Okay.  And are there documents that would

                                                    131

1    indicate what newly-hired teacher was separated in the

2    RIF?

3        A    Yes.

4        Q    What are those documents?

5        A    I believe it would be an employee database that

6    would have start dates on it which would tell us who

7    was hired and when.  Then we would run that against

8    the RIF list.

9        Q    Have you seen the declaration of Michelle Rhee

10   that is attached to DCPS' opposition to the

11   preliminary injunction?

12       A    Yes.

13       Q    What did you have to do with creating that

14   declaration?  Did you write that?

15       A    No.

16       Q    Have you read it?

17       A    Yes.

18       Q    And when did you read it?

19       A    I reviewed it last night.

20       Q    Okay.  Did you read it in preparation for your

21   testimony here today?

22       A    I reviewed it because I knew I was coming to the

23   hearing.

24       Q    Okay.  Do you know how many excess teachers were

25   separated in the RIF?

132

```
 1      A     I believe just under half, sir.

 2      Q     So just under half of the people separated were

 3   excess?

 4            THE COURT:  No.  I think it's the opposite.

 5            THE WITNESS:  No.  I believe of the 160 teachers

 6   who had not found placements by July 15, I believe a

 7   little more than half are still with us; a little less

 8   than half were separated in the reduction.

 9            THE COURT:  So that's of the 160?

10            THE WITNESS:  Yes, ma'am.

11            THE COURT:  Not of the 400?

12            THE WITNESS:  No.  Of the 160, yes, that's

13   correct.

14            MR. JACKSON:  In her deposition [sic],

15   Chancellor Rhee was --

16            THE COURT:  Not her deposition.  You mean her

17   affidavit, her declaration.

18            MR. JACKSON:  Oh, yes, I'm sorry.

19            BY MR. JACKSON:

20      Q     Her declaration attached to DCPS' opposition to

21   the preliminary injunction, which you read last night,

22   chancellor Rhee takes the position that all positions

23   were fully funded when they were hired.

24            But isn't it true that DCPS knew of a potential

25   budget shortfall of 12 to 13 million by June of 2009?
```

133

1     A     That is not true.

2     Q     It is your testimony that the budget shortfall,

3   which you say caused this RIF to happen, was caused

4   solely by the action of the Council, the D.C. City

5   Council, in taking away what you say was $21 million

6   from the DCPS budget?

7     A     No, that's not my testimony.

8     Q     What part did Council action have to do with the

9   budget shortfall which you now say caused the RIF to

10   happen?

11     A     On July 31st, Council reduced our budget from

12   $568 million to $550 million.  In addition, they

13   eliminated the $3 million set aside that was reserved

14   if our enrolled crossed 44,681 students.  That

15   $21 million reduction was basically the straw that

16   broke the camel's back.

17     Q     So Council's action in the reduction of

18   $21 million is what caused the RIF to happen?

19          MR. UTIGER:  Your Honor, this has been asked and

20   answered several times.

21          MR. JACKSON:  It has never been answered, Your

22   Honor.  It has been asked several times.

23          THE COURT:  I don't think that's fair, but I

24   will let you answer it one more time, in any event.

25          THE WITNESS:  Counsel's reduction was a

                                                      134

1    significant portion of why we needed to reduce staff.

2    Quite candidly, as I shared earlier, we had offset the

3    central budget to cover the 160 teachers who had not

4    found placements in mid-July.  When another -- when

5    $21 million was reduced at the end of the month, there

6    was just no place else to go.  We could not cover that

7    reduction.

8            BY MR. JACKSON:

9       Q    Who was it that decided that a RIF was what had

10    to be done?  Who within DCPS made that decision?

11      A    The Chancellor.

12      Q    Did you play any role in making that decision?

13      A    It was ultimately the Chancellor's decision to

14    make.

15      Q    Okay.  But did you play any role in making that

16    decision?

17      A    I was definitely --

18            MR. UTIGER:  Your Honor, I am going to object.

19    This is going --

20            THE COURT:  I am going to sustain that

21    objection.  It doesn't matter who else was consulted

22    within the staff.  If the Chancellor says she decided

23    it, and we're dealing with the Chancellor's decision.

24            BY MR. JACKSON:

25      Q    You are not a lawyer, are you?  A lawyer, an

                                                          135

1    attorney?

2    A    Yes, I am a lawyer.  I am licensed to practice

3    in the State of Ohio.

4    Q    Okay.  And where did you receive your JD?

5    A    Case Western Reserve University.

6        MR. UTIGER:  Your Honor, this is not a

7    deposition.  I fail to see the relevance of this line

8    of questioning.

9        MR. JACKSON:  The witness gave testimony with a

10   legal conclusion in it, speaking about the

11   Anti-deficiency Act.  So the question as to whether or

12   not she has a basis for making a legal conclusion is

13   relevant.

14       THE COURT:  Counsel, with all respect, it seems

15   to me that you don't need to be a lawyer to know that

16   if you're a Government agency and you are spending

17   money you don't have, you are violating the

18   Anti-deficiency Act.  But why don't we move on?

19       MR. JACKSON:  Well, I think --

20       THE COURT:  I mean, whether -- she testified

21   that, that -- actually, what she testified to was that

22   violating the Anti-deficiency Act was not an option.

23   That's what she said.

24       MR. JACKSON:  That meant that she made a

25   conclusion.

136

1          THE COURT:  No.  It meant that as far as she

2     understood, as chief of staff of the D.C. Public

3     Schools, violating the Anti-deficiency Act is not an

4     option.  I assume that she would reach that conclusion

5     whether she was a lawyer or not.

6          BY MR. JACKSON:

7     Q    Am I correct that it is DCPS' position that

8      probationary employees can be separated because they

9      are at will?

10         MR. UTIGER:  Your Honor, this isn't a 30(b)(6)

11    deposition either.

12         THE COURT:  No.  I'm sorry, Counsel.  That's

13    not -- I'm aware that there is another proceeding

14    pending that involves issues of probationary employees,

15    and I don't think that -- that's not an issue here.

16    Whether they could have taken action with regard to

17    probationary employees based on their probationary

18    status or not, that isn't what they chose to do.

19         Is that right?

20         MR. JACKSON:  Yes, your Honor.  And that very

21    point is part of our argument that --

22         THE COURT:  No, because you -- I don't think it

23    is, Counsel.  I don't think it is.  I don't -- I mean,

24    the fact that Chancellor Rhee may have had -- you

25    may -- okay.  I see what you are saying.  They said

                                                       137

1    they didn't have any other option --

2         MR. JACKSON:  Yes, exactly.  That's the point.

3         THE COURT:  But I don't -- but to the extent

4    that there's a probationary employee in a position

5    that's considered to be a position that requires --

6    that has to be filled.

7         MR. JACKSON:  Well, there were 934 probationary

8    employees hired this year.

9         MR. UTIGER:  Your Honor, part of this problem is

10   that this --

11        THE COURT:  This is a moving target.

12        MR. UTIGER:  -- law firm on behalf of this Union

13   has taken the position that you cannot RIF or that

14   probationary employees can only be fired for cause.

15        THE COURT:  I know.  Not only are they taking

16   that position, but there is currently a lawsuit that

17   they filed that's been stayed pending the arbitration,

18   although that position is not entirely clear.  As I

19   understand it, there is a lawsuit that --

20        MR. UTIGER:  That is now on appeal.

21        THE COURT:  Oh, that's now on appeal.  What?

22   The stay or -- the decision to allow the arbitration to

23   go forward is now appeal.

24        So you are currently litigating that issue, but

25   you have taken the position that, in fact --

1          MR. JACKSON:  Exactly.

2          THE COURT:  So you have taken the position that

3     the discharge of a probationary employee can only occur

4     for cause, and that's it's grievable under the Union

5     contract and you are litigating that right now; isn't

6     that right?

7          MR. JACKSON:  That's right.

8          MR. UTIGER:  And now Your Honor they're trying

9     to suggest that doing exactly what they say is illegal

10    would have been an alternative.

11         MR. JACKSON:  We are not trying to suggest

12    anything.  We are asking the question of a management

13    person within DCPS.

14         THE COURT:  I don't think that -- I mean, even

15    if they did have other options, the point is that I

16    think as a matter of law you are not disagreeing that

17    Chancellor Rhee has the authority to make budgetary --

18    to determine how to allocate resources.  There

19    certainly isn't any legal basis for me to decide that

20    you shouldn't do a RIF because you could have gotten

21    rid of all the probationary employees --

22         MR. JACKSON:  And we're not asking that --

23         THE COURT:  -- and bought yourself another

24    lawsuit instead.

25         MR. JACKSON:  We're not asking that you do that.

1    The point of this is that we're making the argument,

2    and we have to prove to you, that this was not a RIF

3    but a mass discharge.

4         THE COURT:  But, again, since you've taken the

5    position that getting rid of a probationary employee is

6    also a discharge, if they had gotten rid of 934 of the

7    new employees rather than 388 or 266 or however many it

8    was of the current employees, that would have been even

9    a -- that would have been a mass discharge that's more

10   than twice as big, at least more than twice as massive.

11        MR. JACKSON:  Well, if it only had to get

12   reduced by 266 --

13        THE COURT:  Now, I understand that some --

14   well --

15        MR. JACKSON:  Yeah.

16        THE COURT:  -- no.  It's not 266.

17        MR. UTIGER:  Probationary teachers are all, most

18   all, not necessarily because they can come in with an

19   increased step, but they're all at the lower end of the

20   pay scale.

21        THE COURT:  But I take it, some of the

22   probationary -- were some probationary employees RIFed?

23        THE WITNESS:  Yes.  Yes.

24        THE COURT:  Well, and let me ask you it this

25   way:  Did you consider the -- I understand that the

                                                      140

1    Government might object -- but did you consider the

2    option of just de-hiring everybody that -- all the new

3    hires?

4         THE WITNESS:  Your Honor, we considered every

5    option, and come early August, the goal was how do we

6    minimize disruption to students into schools.  And had

7    we taken the least senior folks, which historically

8    tend to go to the schools that are in the highest

9    needs, those are the ones that don't have the steadiest

10   workforce, we would have had to move teachers from

11   other schools to fill those schools' vacancies.  It was

12   going to be completely disruptive.

13        And then second is, we know come September,

14   people like to say, after Labor Day is when everybody

15   comes back to school, we need to do some movement

16   because we did a really good job this year of

17   predicting what our enrollment would be across the

18   system, but there is always discrepancies of different

19   schools.  And the idea of having two massive moves,

20   before school opened and right after movement, was just

21   not what the Chancellor determined to be in the best

22   interest of our young people.

23        THE COURT:  Counsel, you can follow-up on that

24   question if you want to.

25        BY MR. JACKSON:

                                                    141

1     Q     Isn't it correct that D.C. City Council directed

2     DCPS to trim summer school, and DCPS decided not to do

3     that?

4          MR. UTIGER:  Object to the form of the question

5     to the word "direct."

6          THE COURT:  He asked if it was correct, so she

7     can answer the question.

8          THE WITNESS:  What the Council did is they

9     reduced or cut in half the summer school budget or the

10    amount allocated for summer school.

11    Q     What was the response of DCPS to that?

12    A     The Chancellor considered her options,

13    thought --

14         MR. JACKSON:  I object to the witness testifying

15    what someone else thought.

16         BY MR. JACKSON:

17    Q     I'm asking you about what facts you know.

18         THE COURT:  You asked what the response was, so

19    she's responding to your question.  You asked her an

20    open-ended question.  She can respond with an

21    open-ended answer.

22         MR. JACKSON:  All right.

23         THE COURT:  Go ahead.

24         THE WITNESS:  The Chancellor determined that

25    summer school is far too critical of an intervention

                                                      142

1    for our young people that we needed to reallocate

2    funding to support summer school.

3        Q    And did she take action --

4            THE COURT:  Which summer school are we talking

5    about?  Are you talking about this past summer or next

6    summer?

7            THE WITNESS:  The upcoming summer school.

8            BY MR. JACKSON:

9        Q    Did she take any action based on that

10   determination?

11       A    No.  She has not reallocated any funds to summer

12   school yet.  First we have to separate the staff,

13   achieve those savings and then redirect them to summer

14   school, but that hasn't occurred yet, sir.

15           MR. JACKSON:  Thank you, your Honor.  I have no

16   other questions.

17           MR. UTIGER:  No more questions, your Honor.

18           THE COURT:  Thank you very, very much.

19           What we are going to do -- Anything further from

20   the Government?

21           MR. UTIGER:  No, Your Honor.

22           THE COURT:  Do you anticipate any further

23   testimony from the Plaintiffs?

24           We are going to take a lunch break.

25           THE MR. JACKSON:  We don't anticipate presenting

                                                        143

```
 1    any other witnesses, but could I hold that until
 2    after --
 3            THE COURT:  Right.  I'm going to let you think
 4    about that over lunch, but it would only be in response
 5    to Ms. Ruda's testimony, obviously.
 6            And why don't we resume at 2:30, because that
 7    gives us a little bit of time.  Thank you very much.
 8            Does that work for you?
 9                (The witness was excused.)
10                (A lunch recess was taken from 1:07 p.m.
11    until 2:33 p.m.)
12            DEPUTY CLERK:  All rise.
13            This Honorable Court is again in session, the
14    Honorable Judge Bartnoff presiding.  Please be seated
15    and come to order.
16            THE COURT:  Good afternoon.
17            DEPUTY CLERK:  Your Honor, recalling in the
18    matter of Washington Teachers' Union, Local Number 6
19    versus Chancellor Michelle Rhee, Civil Action
20    7482-2009.
21            Parties please restate your names for the
22    record.
23            MR. JACKSON:  My name is Lee Jackson.
24            MS. ZWACK:  Brenda Zwack.
25            MR. UTIGER:  Good afternoon, Your Honor.
```

                                                            144

1    Robert Utiger for the District of Columbia, and with me

2    at counsel table is Ellen Effoes, and also sitting

3    behind me are David Sandman, who is the general counsel

4    for DCPS and Dan McCray, who is also from DCPS.

5            THE COURT:  I think -- is Ms. Coo with us as

6    well?

7            MR. JACKSON:  Yes, your Honor.  Jennifer Coo.

8            THE COURT:  Mr. Jackson, you're standing in the

9    front of her, so I didn't see her.

10           I take it we have finished -- there are no

11   further witnesses for the District of Columbia; is that

12   right?

13           MR. UTIGER:  That's correct, Your Honor.

14           THE COURT:  Any further witnesses for the

15   Plaintiffs?

16           MR. JACKSON:  Your Honor, we do have one

17   witness.

18           THE COURT:  Okay.

19           MR. JACKSON:  George Parker.

20                    *  *  *  *  *

21   Thereupon,

22                   **GEORGE PARKER,**

23   having been called as a witness for and on behalf of

24   the Plaintiff and having been first duly sworn by the

25   Deputy Clerk, was examined and testified as follows:

                                                        145

                         DIRECT EXAMINATION

            BY MR. JACKSON:

     Q     Would you state your name for the record,
please?

     A     George Parker, G-E-O-R-G-E, P-A-R-K-E-R.

     Q     And do you hold any position with the Washington
Teachers' Union?

     A     I am president of the Washington Teachers'
Union.

     Q     Okay.  And how long have you held that position?

     A     Since February of 2005.

     Q     Did there ever come a time when you became
employed within D.C. Public Schools?

     A     Yes.

     Q     And when did you first become employed?

     A     1980.

     Q     And what was the position you were hired for?

     A     Secondary mathematics teacher.

     Q     And from the time you first started working as a
teacher within DCPS, until the present, did you
continue employed by DCPS?

     A     Pretty much, yes.  I had maybe one break in
service.

     Q     Now, what are your duties as president of the
Washington Teachers' Union Local #6?

                                                      146

1      A     Main duties, one would be to negotiate the WTU

2   contract, to enforce the contract and to improve

3   working conditions for teachers, to resolve problems

4   as they arise and to try to promote quality education

5   in the District.

6      Q     Now, what subject did you teach?

7      A     Mathematics, secondary.

8      Q     Secondary, meaning?

9      A     Seven through 12, actually.  I taught high

10   school level and junior high school level.

11   secondary --

12          THE COURT:  Is it a requirement to be a Union

13   official that you be good at math?  It doesn't hurt?

14          THE WITNESS:  It doesn't hurt.

15          BY MR. JACKSON:

16      Q     And what was your last school assignment before

17   you become president of the WTU?

18      A     Eliot Junior High School.

19      Q     Now, as president of WTU, do you perform any

20   function that has to do with enforcement of the terms

21   of the collective bargaining agreement?

22      A     That's pretty much a major portion of it, every

23   day all day, almost.

24      Q     Okay.  And in performing that function, are you

25   required to meet with DCPS officials?

                                                              147

1      A     Yes.

2      Q     Now, were you present in the room when Ms. Ruda

3    testified?

4      A     Yes.

5      Q     And did you know her before she took the witness

6    stand today?

7      A     I know her, not personally, but yeah, I've had

8    some interaction with her.

9      Q     Okay.  Now, did you hear Ms. Ruda's testimony

10   with regard to the obligation of teachers who had been

11   excessed, to find jobs for themselves or positions?

12     A     Yes.

13           MR. UTIGER:  Objection, your Honor.  I think

14   that mischaracterizes the testimony.

15           THE COURT:  I did not understand -- I don't

16   recall that she used the word "obligation."

17           MR. JACKSON:  Okay.

18           BY MR. JACKSON:

19     Q     Did you hear --

20           THE COURT:  What she said was that -- and I

21   think it was in response to questions from me.  She

22   said that they had the opportunity to find other

23   placements and that all but a certain number had found

24   placements.  But she didn't use the word "obligation,"

25   I don't believe.

                                                      148

1          MR. JACKSON:  Okay.

2          BY MR. JACKSON:

3     Q    What do you know about the obligation of DCPS to

4     place a teacher who is excessed.

5     A    A teacher who is excessed, has a right, and DCPS

6     is required to place the teacher without interviewing

7     or without seeking a position at a given school.  DCPS

8     has a requirement, in the WTU contract, to place every

9     excessed teacher by July 31st.

10    Q    Of each year?

11    A    Of each year.

12    Q    Okay.  Now, I draw your attention to July 31st

13    of this year, 2009.  Did it come to your attention

14    that following July 31st, 2009, there were excess

15    teachers who had not been placed?

16         THE WITNESS:  Can I answer that in a way that I

17    understood it, Judge?

18         THE COURT:  Yeah.

19         THE WITNESS:  Okay.

20         MR. JACKSON:  Just answer the question.

21         THE COURT:  You can't answer it any other way.

22         THE WITNESS:  Well.  Okay.

23         I was informed by DCPS Office of Human Resources

24    that all excess teachers had been placed by July 31st.

25         BY MR. JACKSON: