1   driven.

2        If she had had another priority that needed --

3   that she thought would provide better services to the

4   children and needed to make room in the budget, if

5   there was a reading program that cost $21 million that

6   would increase the reading rate in the District by

7   35 percent, she could have done a RIF to get that

8   $21 million.

9        THE COURT:  But what she couldn't do -- I'm not

10  saying that there's evidence of this, but if -- if she

11  had known that she didn't have the money to hire the

12  people who were hired in the summer -- I understand

13  that your position is that she had no reason to think

14  that she didn't have it, and that after the deal that

15  was made with the Council, she had every reason -- she

16  had even more reason to believe that she did have it.

17        But if she had known that she didn't have it and

18  hired the people anyway, could she hire people that she

19  didn't have the money for and then RIF other people

20  afterward to pay for them?

21        MR. UTIGER:  It's an interesting --

22        THE COURT:  I understand it's a lot of ifs.

23        MR. UTIGER:  Yeah, it is a lot of ifs, Your

24  Honor.

25        THE COURT:  And I asked Mr. Jackson some

                                                    225

1   hypothetical questions, so I might as well ask some of

2   you too.

3        MR. UTIGER:  And, no.  If she had done it and if

4   there was any evidence that it was done for an improper

5   purpose.

6        THE COURT:  In other words, if she hired or if

7   she knew she had enough money to pay for -- if she knew

8   that she had a budget that would support new hires up

9   to 550 million, say, and -- that's probably a

10  bad number -- but if she knew that she had that and she

11  hired at levels that took her to 500 -- if she hired at

12  levels that took her above any reasonable budget

13  expectation, suppose she hired at levels that would

14  have gotten her to 600 million and that she knew she

15  didn't have, could she then say, well, I've to RIF all

16  these people because of these hires?  That gets a

17  little sketchy, doesn't it?

18       MR. UTIGER:  And I think that's right.  While I

19  haven't thought it through far enough to consider

20  what -- I would certainly not feel comfortable

21  defending that.  But there's no evidence of that.

22       THE COURT:  So the point is, she can do a RIF if

23  she thinks she needs to for budgetary reasons, but you

24  agree that she can't take some kind of action that

25  manufactures a crisis.

1          MR. UTIGER:  That's correct, your Honor, but she

2     didn't.

3          THE COURT:  But you don't think that's this

4     case?

5          MR. UTIGER:  And for the purpose of this motion,

6     there's absolutely no evidence in the record that it

7     is.  And all the record evidence is that for every

8     teacher that was hired, there was adequate budget at

9     the time they were hired, and there had been no notice

10    from the Council that that budget authority was going

11    to be pulled.

12         So now we go to the question of whether or not

13    this is grievable at all, whether or not Plaintiffs'

14    underlying theory -- and what they want to do, their

15    requested relief is a stay pending arbitration.

16         THE COURT:  Right.

17         MR. UTIGER:  And I don't want to re-argue

18    everything that's in our papers.  I know The Court has

19    read that, but we don't think that this is arbitrable,

20    and I think we've established that it isn't arbitrable.

21    I know Plaintiffs filed, yesterday, a case and they

22    appeared -- and, again, it was a little unclear because

23    it was filed as a precipe attached to a declaration

24    from Council.  But what they appear to argue --

25         THE COURT:  They're not going to do that again.

1          MR. UTIGER:  No, your Honor.  I would assume

2     not.

3          And the -- but what appears that they argue

4     there is that somehow that case is evidence that we've

5     agreed to arbitration and, therefore, we've waived any

6     argument to the contrary.  That argument is statutorily

7     barred.  And it's statutorily barred -- and let me walk

8     through the entire reason why they don't get there.

9          The CMPA, it's D.C. Code 1, Section 61708, talks

10    about management rights.  And Subparagraph A, and I'll

11    read it:  The respective personnel authorities, in

12    parens, management, that's DCPS, that's the Chancellor,

13    shall retain the sole right in accordance with

14    applicable laws and rules and regulations 3,

15    Subparagraph 3, to relieve employees of duties because

16    of lack of work or other legitimate reasons.

17         That's a language that's used to describe a RIF.

18    That's what you do in a RIF.  There's not enough work

19    or you want to do something else, you want to get rid

20    of doing the job, and we cut entire programs.

21         THE COURT:  And that includes you don't have

22    enough money for it?

23         MR. UTIGER:  Correct, your Honor.

24         THE COURT:  That's the statutory authority for a

25    RIF?

1       MR. UTIGER:  That's right, your Honor.  Though,

2   it doesn't actually require that there be.  If there's

3   not enough work, that's another reason to do it.  But

4   other legitimate reasons encompasses budget deficits.

5   So that's the reason why the District can RIF, why it's

6   a management right, and why -- because it's a

7   management right, and we explained that in the papers,

8   it's not subject to arbitration.

9       And no Union contract -- even if there had been

10  explicit language in a Union contract, that would have

11  been barred by statute.  It would have been overturned

12  by statute.  Here, you don't even have that.  This

13  collective bargaining agreement addresses a RIF only in

14  the context of notice to the Union and consultation,

15  and I'll get to that later, but...

16      To their argument that this case that they cite

17  and that they put in front of The Court somehow waives

18  our management right, Section -- D.C. Code 1, Section

19  617.08(a)(1), management's rights cannot be waived by

20  prior conduct.  Nothing we did -- The Court's

21  indulgence.  This is what the exact language is.  An

22  act, exercise or agreement of the respective personnel

23  authorities, again management, shall not be interpreted

24  in any manner as a waiver of the sole management rights

25  contained in Subsection A of this section.

1        That's not ambiguous.  There is no waiver.  Even

2    assuming that the prior case, which was under the

3    Abolishment Act, not the RIF Act, somehow evidenced an

4    agreement by the District's to arbitrate this, it

5    doesn't matter.  By statute, we have not waived that

6    argument in this case.

7        THE COURT:  Explain to me the difference between

8    the Abolishment Act -- I take it, you're not claiming

9    the difference between the Abolishment Act issue and

10   the RIF statute?

11       MR. UTIGER:  For purpose of this case, there is

12   no difference.  The requirement is the same.  A

13   management right -- the management right is not

14   contained in either the Abolishment Act or the RIF

15   statute, it's contained in the CMPA, and it applies

16   across the board.  So the management right, the

17   distinction in this case is of no moment.

18       THE COURT:  Got it.  The point is that this RIF

19   wasn't done under the Abolishment Act?

20       MR. UTIGER:  That's right, your Honor.  And --

21       THE COURT:  Is there an Abolishment Act anymore?

22       MR. UTIGER:  I believe there is.

23       So they got no irreparable harm.  The harm to

24   the District is patented, given the budget crises.

25   They've made no real showing their argument that

1   somehow this is necessary in aid of arbitration.  They

2   set the standard, but they make no argument that the

3   facts support it here.

4        They say we're going to say it's hard to put

5   these people back on at the end of the day, and we

6   will, the same thing we're going to say today, you

7   know.  That's not necessarily a reason why a Court

8   would not grant them relief of some kind, you know.  We

9   certainly have the right to argue what that relief

10  ought to be.  But that's not the kind of frustration

11  that the cases they cite talks about.

12       They've made no real showing.  There's been a

13  lot of smoke, but no real showing.  And, you know,

14  their latest argument has been that for some reason we

15  didn't -- they argue we did not discuss this matter

16  with them, and I find that hard to understand.  The

17  testimony here was that there was a meeting; they knew

18  about the RIF.  We had a meeting discussed what their

19  view of the RIF was.  They made a suggestion; we

20  rejected it.  They made no argument that that's not

21  collaboration or consultation.  We consulted, they just

22  didn't like the answer.  And they made no argument that

23  the remedy for consultation would be to stay the RIF

24  and impose a $21 million penalty on the District.

25       Unless The Court has any questions.

                                                    231

1      THE COURT:  Do you have any -- I'm not sure it's

2   really at issue, but do you have any comments about

3   this excess teacher issue?

4      MR. UTIGER:  Yes, your Honor.  And I was

5   thinking about this while we had a break.  And it's

6   hard to understand exactly what Plaintiffs suggest

7   here, and I think this is a little bit -- the excess

8   teachers --

9      THE COURT:  I think some of what they're saying

10  is that there were people, which may just go to the way

11  the RIF was done and not the RIF itself, but I

12  understand them to be saying that there were people who

13  were put in situations where there were excess teachers

14  who were entitled to be put in positions that gave them

15  more security than the positions they were put in and

16  as a result, they ended up being RIFed when they

17  shouldn't -- when, had they been in the positions that

18  they think they were -- had they been in the types of

19  positions that they think they were entitled to, they

20  would have either not been in positions that would have

21  been RIFed at all, or they wouldn't be RIFed.

22      MR. UTIGER:  First off, your Honor --

23      THE COURT:  I think that's right.  I think

24  that's the argument.  I don't want to blame Mr. Parker

25  for shaking his head yes when I said it that way, but I

232

1    think that goes to -- that there were people who were

2    put -- who were made vulnerable because of the

3    positions that they didn't get that they were entitled

4    to.

5         MR. UTIGER:  Well, my first comment on that is,

6    they've said it; they haven't demonstrated it.  They

7    haven't attempted to demonstrate and they haven't

8    demonstrated or even argued that that result for those

9    individuals justifies the injunction they seek.

10         They haven't just talked about those people.

11   The injunction they seek doesn't go to those

12   individuals, it goes to the entire RIF.  So even if you

13   accepted their argument, it wouldn't justify the

14   preliminary injunction they seek, and they haven't

15   supported the argument.

16         THE COURT:  And at most, it goes to something

17   under 80 people?

18         MR. UTIGER:  Yeah.  And there's another point,

19   your Honor, and that's the fact that they haven't

20   grieved that.  They didn't feel strongly enough about

21   it to grieve it.  If they haven't grieved it, they

22   can't arbitrate it.  If they can't arbitrate it, the

23   Court can't issue an injunction on that --

24         THE COURT:  So, in other words, that wouldn't

25   even be the subject of the arbitration that they're

                                                      233

1    asking to have a preliminary -- that they're claiming

2    requires that a preliminary injunction be issued.

3         MR. UTIGER:  That's correct, your Honor.

4         THE COURT:  You may get the grievance tomorrow.

5    So what.  In other words, your point is, it's not

6    subject to arbitration at least yet?

7         MR. UTIGER:  That's correct, your Honor.  And

8    our argument is that none of this is subject to

9    arbitration.

10         THE COURT:  Because the arbitration -- because

11    RIFs aren't subject to arbitration.

12         MR. UTIGER:  Because RIFs aren't subject to

13    arbitration.  And I want to say one thing about some of

14    the testimony today.  The Plaintiffs put on a couple of

15    individuals, and I have no reason -- we did not know

16    what they were going to say, but I have no reason to

17    think that what they said wasn't right, or that it was

18    right.  But taking as true the testimony of the two

19    individuals who explained the circumstance of their

20    RIFs, I remember vividly the blind gentleman, based on

21    what they said, if they think that the RIF procedures

22    were applied wrongly to them, they should go to the

23    OEA.

24         The statute has a mechanism for correcting --

25    there are 4,000 teachers in DCPS for 4,000 decisions;

                                                    234

1     4,000 people got looked at.  The odds that no errors

2     were made is pretty small.  The relief for those kinds

3     of individual problems is an appeal to the OEA.

4            THE COURT:  Well, I don't know that it's true

5     that 4,000 teachers necessarily get looked at, because

6     I thought that you only looked at the teachers who were

7     in the positions who the principals decided to RIF.

8            MR. UTIGER:  Well, that's true, your Honor.  But

9     they had to look at, virtually, all the positions to

10    decide which ones they were going to eliminate.  And

11    there are any number of parameters where someone could

12    make an argument that, as applied to them, the

13    procedure was wrong.  And there is -- and that's what

14    we're really talking about here.

15           Plaintiffs tried to get around the requirement

16    to go to the OEA by saying, well, they're not really

17    arguing that the procedures are wrong.  And I think

18    they're kind of stuck with that.  They've said it now

19    several times before The Court that they're not arguing

20    that the procedures in the RIF were wrong.

21           THE COURT:  But just to be clear, I did not take

22    -- I'm saying this to you, but I'm saying it to

23    Mr. Jackson as well -- I did not take that argument

24    from the Union to be precluding any claims by any

25    individual teachers that they thought the RIF was wrong

                                                          235

1   as applied to them, assuming it was a RIF.  I didn't

2   think Mr. Jackson was suggesting that.

3          MR. UTIGER:  And we don't take that --

4          THE COURT:  Is that right, Mr. Jackson?

5          MR. JACKSON:  No, your Honor, I was not

6   suggesting that individuals would be precluded.

7          THE COURT:  Not only that, but there may well be

8   teachers who believe that -- I mean, they may have

9   questions about the whole process, but they certainly

10  believe that, assuming it was a RIF, they shouldn't

11  have been RIFed and they, obviously, have whatever

12  remedies are available to them.

13         There also were some teachers who believe, as I

14  understand it based on other cases I'm aware of that

15  have been filed in This Court, that the way in which

16  the RIF was -- that various other things that were done

17  were problematic.  And I know that there have been

18  several claims filed against the City or I think it's

19  really against D.C. for intentional infliction of

20  emotional distress, for example, because of the way

21  people were marched out of the schools.  Nothing that

22  you've said today would, in any way, affect any of

23  these claims.

24         In fact, even it were the case that somebody was

25  to find, later on, that someone has been improperly

                                                    236

1    separated for whatever reason, that claim could

2    continue.

3            MR. UTIGER:  I think that's right, your Honor.

4    I think the only way that the individuals would be

5    bound is if the Union took a class-type grievance to

6    the OEA and represented their interest in it.  As

7    things stand now, with them not having gone to the OEA,

8    I think individuals have a right to go to the OEA for

9    their individual circumstances.

10           THE COURT:  So nobody is suggesting that

11   individuals can't go to the OEA if they want to?

12           MR. UTIGER:  No, your Honor.

13           THE COURT:  The District's not claiming that?

14           MR. UTIGER:  No, your Honor.

15           THE COURT:  I take it the Union isn't either?

16           MR. JACKSON:  No, your Honor, we are not.

17           MR. UTIGER:  In fact, we're arguing if they have

18   that concern with the procedures that's where they have

19   to go.

20           THE COURT:  Okay.

21           MR. UTIGER:  And as the last point, and I think

22   it was one of the first things we put in our papers,

23   what the Plaintiffs were asking you to do at heart,

24   given that there's no colorable evidence of some

25   conspiracy at DCPS to conduct a RIF to get rid of

                                                    237

1    teachers, nothing in the record, what they're asking

2    The Court to do is to take a look at the decision the

3    Chancellor made and decide whether or not it was a --

4    the best way to balance the budget.

5        They put on a lot of argument and a lot of

6    testimony that there were other things we could have

7    done.  Some of the suggestions are patently illegal.

8    For instance, there was a suggestion that we could have

9    taken all the new hires and fired them.  Here's the

10   problem.  Once we hire them, they have rights, and the

11   only way we could get rid of the new hires is by

12   conducting a RIF, the RIF we conducted.

13       To simply take those individuals and fire them,

14   that would be the Fifth Amendment claim I wouldn't want

15   to have to defend.  Once they were hired, once they

16   were on the roll, that was the only option we had.

17       THE COURT:  Would be to RIF them?

18       MR. UTIGER:  Yes, your Honor.  Because I know of

19   no statutory basis for simply taking the last hired and

20   firing them.

21       THE COURT:  And I take it that their status as

22   probationary employees doesn't matter for this purpose.

23       MR. UTIGER:  Well, it's a very interesting

24   argument.

25       THE COURT:  Right.  Especially in light of the

1    other case.

2         MR. UTIGER:   Yeah.   There may be an argument

3    that if the -- and I certainly don't think the

4    Chancellor would be required to do it, but we have

5    argued that within the probationary period, even if a

6    teacher has not committed misconduct, they can be

7    terminated for poor performance.

8         And I'll query whether or not during their

9    probationary -- and we haven't addressed that issue

10   because it wasn't part of the case -- whether or not

11   during the probationary period we could fire them

12   because we don't have enough -- we don't have enough

13   room.  But the problem here is the sole Plaintiff here

14   is the Union, and the Union is taking the position in

15   another litigation that we can't do that.  In fact, we

16   can't terminate them for anything other than for cause

17   termination.

18        THE COURT:   Well, I think the other -- I take it

19   the other thing is that if you were to RIF -- if you

20   were to do a RIF, you couldn't, under the RIF statute

21   and regulations, say we're going to RIF everybody who

22   was hired within the last three months.

23        MR. UTIGER:   That's right, your Honor.

24        THE COURT:   That isn't the way you are allowed

25   to do a RIF under the RIF statute.

239

1      MR. UTIGER:  That's correct, your Honor.  There

2  are ways to do it, especially at DCPS, because teachers

3  aren't fungible.  It's a little bit harder than when

4  you're doing RIFs other places because you have to

5  identify positions, the needs of the school.  You know,

6  one teacher -- even one good teacher and another good

7  teacher don't necessarily have the credentials that

8  meet the requirements.  It is a more complicated

9  process.

10      But what you can't do is simply say the criteria

11  for RIFing is going to be that you were hired in the

12  last few months.  There are factors that have to be

13  considered under the --

14      THE COURT:  Under the statute.

15      MR. UTIGER:  -- under the statute, and it

16  doesn't allow that.

17      The Court has no other questions?

18      THE COURT:  At this point I don't.  I know it's

19  late, but anything in response, Mr. Jackson?

20      MR. JACKSON:  Could I have just a minute, your

21  Honor.

22      THE COURT:  Sure.  Ms. Zwack?

23      MS. ZWACK:  Yes, Your Honor.  I just want to

24  make a couple of points here.  DCPS has relied upon the

25  management rights statute and the CMPA, to essentially

                                                        240

1    say that they can make a decision to conduct a RIF, and

2    I don't think that it's the Union's position that DCPS

3    can never do a RIF.  But if there are contractual

4    provisions, management rights clause in the CMPA,

5    doesn't void those contractual protections.  I just

6    want to make that a clear distinction.

7         And the Public Employer Relations Board has also

8    addressed the fact that if the parties agree to

9    negotiate over something that is arguably within

10   management's rights, that then they come to an

11   agreement and there's a collective bargaining

12   agreement.  That collective bargaining agreement is

13   enforceable.  And so I think there was just a little

14   bit of misleading commentary about the management

15   rights statute.

16        THE COURT:  I thought that he was talking about

17   the management right statute primarily in the context

18   of any of the two thousand -- of the case that you

19   provided to me yesterday, that to the extent that there

20   was any -- which dealt -- which was a different

21   contract and a different Union, but that to the extent

22   that you were arguing that -- that they had allowed the

23   issue of -- that they allowed issues relating to RIFs

24   to be addressed in the context of -- of a grievance in

25   a subsequent arbitration under a collective bargaining

                                                    241

1    agreement in the past, that didn't waive their right to

2    say now, we don't have to in a contract that didn't

3    have comparable provisions with regard to the way in

4    which a RIF would be conducted.

5         MS. ZWACK:  Well, I understand that point.  Our

6    point in submitting that arbitration award was

7    simply -- and I understand that this is limited, these

8    are different contracts.  But simply to point out that

9    it's not beyond the realm of possibility that a union

10   and the District of Columbia Public Schools could go to

11   arbitration over a RIF.

12        And I understand it's a different contract, but

13   in DCPS' opposition, they did make the point that it is

14   sort of contrary to the statutory framework that this

15   can't happen.  And our point is it can happen.  I

16   understand your point that this is a different

17   contract, but we submitted it only to the extent that

18   it refutes the point that it is beyond the statutory

19   scheme that parties could arbitrate over a RIF.

20        THE COURT:  So you're not arguing, I take it,

21   that because -- because they apparently did it then,

22   they've waived their right to claim now that they don't

23   have to do it.  You are not making a waiver argument.

24        MS. ZWACK:  I don't think it's a waiver

25   argument.  I think it's a realm of possibility

                                                      242

1    argument.

2         THE COURT:  We're not talking about the realms

3    of possibility here.  We're talking about the actual

4    contract.

5         MS. ZWACK:  Well, in their opposition they did

6    say that it's beyond the statutory --

7         THE COURT:  I know, but I'm not worried about --

8    I have enough to worry about here without worrying

9    about the theoretical issues.

10        MS. ZWACK:  Okay.  Well, that was clarifying our

11   point.  So...

12        THE COURT:  But certainly, what they -- that

13   whatever the issue is -- was in that other contract,

14   the Court of Appeals found that other contract had

15   provisions in it that were very specific about notice,

16   unlike the provision here and that there

17   were provisions -- that they were provisions in that

18   other contract relating to the way RIFs would be

19   conducted, apparently, which is also -- which also were

20   not present in your contract.

21        In other words, even if it were true -- I mean,

22   I understand your problem, and I had it, too, frankly,

23   that had there been provisions in the contract about

24   RIFs, and let's say that there was a provision in the

25   contract that you do a RIF in a certain way and that

243

1   these are the people that get RIFed first, and then

2   they didn't do that.

3       There's something a little anomalous about then

4   entering into a contract, a collective bargaining

5   agreement that says that, and then when you try to

6   grieve it under that agreement, saying no you can't

7   grieve it because we didn't really have to agree to

8   that and the agreement isn't worth the paper it's

9   printed on.

10      But that's not their argument here, because

11  there is no such -- there is -- I think they're saying

12  well, maybe if it had been, then maybe we would argue

13  that, but it isn't, so we don't have to go there.  I'm

14  not sure that was English, but -- in other words, there

15  is nothing other than the consultation provision.

16  There is nothing in this collective bargaining

17  agreement that addresses the way RIFs are conducted?

18      MS. ZWACK:  I think that's correct.  But I think

19  just --

20      THE COURT:  And in the other one, in the case

21  you gave me yesterday, it appears that there was.  Now,

22  I don't have that contract, but I've read the opinion

23  and the opinion refers to provisions in that contract

24  which seem to govern the way a RIF would actually be

25  conducted and who'd get RIFed first, and that's not --

244

1   you didn't -- and that's not this -- the point is, if

2   that was in that contract, it's not in yours.

3        MS. ZWACK:  We are not representing that this is

4   the same contract.

5        THE COURT:  Right.  Okay.  I understand.  Your

6   argument is basically that -- that the fact that

7   there's a management rights clause doesn't mean that

8   they can't agree to whatever they agreed to if they

9   agree to it.

10       MS. ZWACK:  That's right.  And I just wanted to

11  clarify our final point, and that's that DCPS can

12  conduct a RIF.  And we're not saying that they don't

13  have the authority to make that decision.  We're also

14  not saying that there wasn't a budget shortfall or that

15  a way of addressing -- or the way of addressing this

16  budget shortfall was the RIF.  What we're saying is

17  what they did do, even if they needed to do a RIF,

18  wasn't a RIF.

19       THE COURT:  I am now completely lost, and I

20  appreciate that it's four minutes to five.  But you

21  just said you're not arguing that they can't conduct a

22  RIF?

23       MS. ZWACK:  No.  We agree that that's a

24  management right.

25       THE COURT:  And you're not saying that there

245

1    wasn't a budget shortfall?  They are saying -- you just

2    said we're not saying that there wasn't a budget

3    shortfall.  Well, if there was a budget shortfall, and

4    if they imposed the RIF after the budget shortfall, why

5    is the RIF not a RIF?

6         MS. ZWACK:  I'm sorry.  I must have misspoken

7    because I didn't mean to say that we are conceding that

8    there was a budget shortfall.  It was more that if

9    there was a budget shortfall that was not contrived --

10        THE COURT:  But what evidence have you presented

11   me that there wasn't a budget shortfall?  Are you

12   claiming that the Council didn't enact the budgets that

13   have been testified to?

14        MS. ZWACK:  We have a disagreement about how

15   that money was allocated.

16        THE COURT:  But you acknowledge that there's no

17   evidence in the record that the District didn't

18   believe, until July 31st -- there's no evidence in the

19   record that -- that the District -- there's no evidence

20   in the record that the budget was anything other than

21   what the District has testified it was?

22        MS. ZWACK:  Well, we believe that there is

23   evidence in the record.  We have Mary Collins'

24   testimony about what we believe was some fishiness in

25   the budget.  We also take issue with some of the

                                                      246

1    statements that were made in Michelle Rhee's

2    declaration, but she wasn't here to be cross-examined.

3         So I'm not sure that DCPS has, necessarily,

4    proven things, and we didn't have the opportunity to

5    cross-examine Michelle Rhee regarding her

6    declaration, particularly with respect --

7         THE COURT:  You had the opportunity

8    to cross-examine Ms. Ruda.

9         MS. ZWACK:  Well, that's true, but she didn't

10   have decision-making authority and she admitted that.

11        THE COURT:  Anything else?

12        MS. ZWACK:  No, that's it.

13        THE COURT:  Thank you very much.

14        MR. UTIGER:  Your Honor, I just want to add one

15   thing very briefly, and I apologize for not doing it

16   earlier.

17        This is from Title V, Board of Education,

18   Chapter 15, Reduction in Force.  These are the DCMR

19   regs that apply to D.C. past Reduction in Force.

20   1500.5.  The procedure set forth in this chapter shall

21   supercede the terms of any negotiated collective

22   bargaining agreement in force and effect or to be

23   negotiated for the fiscal year ending September 30th,

24   2002 and subsequent fiscal years.

25        We put that in our papers, but I wanted to

247

1   highlight it.

2       THE COURT:  And I take it your view is that that

3   regulation is -- implements the management rights

4   provision of the CMPA?

5       MR. UTIGER:  Yes, your Honor.

6       THE COURT:  In other words, the statutory --

7   because the statutory authority is that?

8       MR. UTIGER:  Absolutely, your Honor.  And while

9   I don't think it's necessarily -- we don't think that

10  there's anything in the collective bargaining agreement

11  to the contrary.  And Plaintiffs have certainly not

12  pointed to anything other than a penumbra.  But even if

13  there were, it would be of no effect.  Plaintiffs

14  should have been --

15      THE COURT:  --

16      MR. UTIGER:  Well, you know, I understood The

17  Court's concern about the District entering into

18  contracts to do things it can't do.  But this was arm's

19  length negotiation with a sophisticated Union

20  represented by counsel.  We don't think we entered into

21  a contract to do what we couldn't do.  But if

22  Plaintiffs thought that that's what we were agreeing

23  to, they were on notice of the statute also.

24      THE COURT:  And the regs?

25      MR. UTIGER:  And the regs.

1          THE COURT:   Thank you very much, everyone.   I

2     expect to have a decision by sometime next week.

3               (The proceedings adjourned at 5:01 p.m.)

4

5                    CERTIFICATE OF REPORTER

6          I, MARGARY F. ROGERS, an Official Court Reporter

7     for the Superior Court of the District of Columbia, do

8     hereby certify that I reported by machine shorthand, in

9      my official capacity, the proceedings had and testimony

10    adduced, upon the Hearing in the case of **Washington**

11    **Teachers Union Local #6 versus Chancellor Michelle Rhee,**

12    **Civil Action No. CA-7489-2009** in said Court, on the 5th

13    day of November, 2009.

14          I further certify that the foregoing 248 pages

15    constitute the official transcript of said proceedings,

16    as taken from said shorthand notes, my computer realtime

17    display, together with the audio sync and tape recording

18    of said proceedings.

19          In witness whereof, I have hereto subscribed my

20     name, this 2nd day of February, 2010.

21

22

23

24    _____

25     OFFICIAL COURT REPORTER

249