**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
WILLIE BREWER                               )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )        Case No. 1:11-cv-01206 (KBJ)
                                            )
DISTRICT OF COLUMBIA, *et al.*,             )
                                            )
            Defendants.                     )
_____ )


**THE DISTRICT'S REPLY TO PLAINTIFF'S SURREPLY TO THE MOTION TO
DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

     Defendant District of Columbia ("the District"), by and through undersigned counsel,

hereby submits this Reply to Plaintiff's Surreply to the District's Motion to Dismiss Plaintiff's

Complaint or, in the Alternative, for Summary Judgment.  [ECF # 39].

     Plaintiff argues that both claims preclusion and issue preclusion are inapplicable to this

case because the judge in the prior *WTU* litigation (*Wash. Teachers Union* 2 *Local #6 v. Rhee, et

al.* No. 2009 CA 007482 B (D.C. Sup. Ct.)) ("Union litigation") intended to preserve "alternative

forums" so that individual teachers could relitigate whether the RIF was pretextual.  However,

Plaintiff's argument fails because he distorts the basic subject matter and context of the hearing

transcript excerpt that he relies on for this proposition.  The unedited version of the transcript of

that hearing on a preliminary injunction makes clear that Judge Bartnoff was only intending to

preserve the teachers' ability to pursue claims at the D.C. Office of Employee Appeals ("OEA"),

which has exclusive jurisdiction over certain claims.  While it makes sense to preserve

employees' rights to pursue certain claims before the OEA (because the OEA has exclusive

1

jurisdiction over those claims), there is no similar justification that would allow a plaintiff to relitigate claims in federal court that he brought (or could have brought) in prior litigation before the D.C. Superior Court.

Plaintiff also argues that WTU denied Plaintiff "a full and fair opportunity to litigate his claims in the union litigation." The record proves otherwise. The WTU litigation concerned more than "whether the Union Litigation was governed by the CBA," as it centered around the primary issue in this case— whether the 2009 RIF was a pretext for terminating 266 teachers. Plaintiff's retort that "[t]he Union actively refused input from Plaintiff" regarding the RIF does not change this fact. Such gripes are common to large scale union litigation and to some extent intrinsic to it. Plaintiff's *post hoc* disagreement with WTU's litigation strategy is neither remarkable, nor a basis for overcoming claims or issue preclusion.

## Argument

### I.     Judge Bartnoff only intended to preserve the OEA as an avenue of relief.

Plaintiff argues that Judge Bartnoff "specifically intended for Plaintiff [Brewer's] claims to survive the Union litigation." [ECF # 39 p. 1]. In support, he cites an excerpt from the Union litigation proceedings where the parties and the Court discuss how the Union's case would affect claims by individual teachers. However, Plaintiff alters two basic features of this excerpt to make his point.

### A.     By altering the text of the transcript excerpt Plaintiff has impermissibly altered the basic subject mattered discussed.

Plaintiff substitutes the word "OEA" with the phrase "an alternative forum" in his discussion of the proceedings before Judge Bartnoff. *See* ECF # 39 at Ex. # 4, transcript pp. 235-237. This substitution misrepresents the entire context of the excerpted discussion because it suggests that the parties were discussing alternative forums, when in fact they were not. Rather,

the District was clearly arguing that if individual teachers "think that the RIF procedures were

applied wrongly to them, they should go to the OEA." *Id.* at 234.  Both the parties and the Court

agreed on this point and *only* this point:

> THE COURT:      So nobody is suggesting the parties can't go to
>                 the OEA if they want to?
>
> MR. UTIGER:     No, your Honor.
>
> THE COURT:      The District's not claiming that?
>
> MR. UTIGER:     No, your Honor.
>
> THE COURT:      I take it the Union isn't either?
>
> MR. JACKSON:    No, your Honor, we are not.

*Id.* at 237.  In fact, the District explicitly argued that the OEA was the only forum available, as

its counsel stated "we're arguing if they have that concern with the [RIF] procedures that's

where they have to go."  *Id*.

Judge Bartnoff's comments reflect her agreement with this understanding.  She stated

that the proceedings before her would not affect a claim "for intentional infliction of emotional

distress, for example," which is quintessentially the type of workplace claim over which the

OEA has exclusive jurisdiction.  *Id.* at 236; *see Holman v. Williams*, 436 F. Supp. 2d 68 (D.D.C.

2006). ("plaintiff's common law claims of… intentional infliction of emotional distress are

preempted by the CMPA"); *Robinson v. District of Columbia*, 748 A.2d 409 (D.C. 2000) (same).

Moreover, in footnote 1 of Judge Bartnoff's summary judgment opinion she states that if a

teacher wants to "challenge the way the RIF was conducted" the teacher should "appeal to the

Office of Employee Appeals."  [ECF # 24, Ex. # 4 at p. 3].

Thus, without Plaintiff's creative editing there is no indication that Judge Bartnoff

intended to allow Plaintiff to bring suit in any alternative forum.  Rather, the District identified

the OEA as the only forum available for a discrete subset of claims and Judge Bartnoff

understood that this was the only forum they were discussing.  Plaintiff's argument to the

contrary relies on disingenuous editing.

      B.    <u>Plaintiff failed to disclose the procedural posture of the hearing in the Union litigation, which makes clear that preclusion of subsequent litigation was not an issue before the Court.</u>

Plaintiff's argument also relies on yet a second critical misrepresentation.  He indicates

that the transcript excerpt came from the "April 23, 2010, Summary Judgment Hearing."

[ECF # 39 p. 3].  But it did not.  The Court reporter certificate states that the transcript is of

proceedings that took place on November 5, 2009.  *Id*. at 25.  The transcript shows that the

certificate is correct, as the parties are discussing the preliminary injunction, which was the

subject matter of the November 5, 2009 hearing.

This error undermines Plaintiff's argument.  A preliminary injunction hearing does not

implicate concerns of preclusion because such rulings are not final judgments and are not

seeking to decide the ultimate issues.  *See Barnhardt v. District of Columbia*, 723 F. Supp. 2d

197, 208 (D.D.C. 2010) ("issues litigated in the context of a preliminary injunction traditionally

would not form a basis for collateral estoppels").  Courts are just trying to decide whether to

issue an injunction on a limited record.  Conversely, a discussion of preclusion at the summary

judgment stage could implicate preclusion because a court would be directly considering how

ruling on the motion would affect other claims.  Moreover, at the summary judgment stage a

court would consider whether the fully developed record could reasonably support a plaintiff's

claims.

Thus, Plaintiff's error regarding the procedural context of the transcript undermines his

argument that Judge Bartnoff "intended for Plaintiff [Brewer's] claims to survive the Union

litigation."  Preclusion concerns would not even arise at a preliminary injunction hearing, because rulings on preliminary injunctions are not final judgments and are not intended to decide the ultimate issues.

      C.      <u>Because the OEA is not an "alternative forum," its availability does not support the proposition that Plaintiff is free to relitigate claims that were or could have been brought in the Union litigation.</u>

Beyond Plaintiff's transcript alterations, his argument also has a more basic flaw.  He attempts to analogize the OEA with a federal district court.  In other words, Plaintiff suggests that the same reasoning that justified preserving a plaintiff-employee's right to later go to the OEA also justifies preserving a plaintiff's right to relitigate his claims in federal district court.  But this conclusion ignores a critical difference between the two forums.  The OEA is not an alternative forum with concurrent jurisdiction with the Superior Court or the United States District Court.  Rather, the OEA complements the jurisdiction of Superior Court (or District Court), in that it has exclusive jurisdiction over certain employee claims.

The OEA, as the administrative tribunal for employee grievances, is the "mechanism for addressing virtually every conceivable personnel issue among the District, its employees, and their unions."  *District of Columbia v. Thompson*, 593 A.2d 621, 634 (D.C. 1991); *see also* D.C. Code § 1-603 *et seq.* (explaining that the OEA is the administrative tribunal for the Comprehensive Merit Personnel Act ("CMPA")).  The OEA therefore has the unique ability to preempt a court of general jurisdiction from adjudicating claims that fundamentally involve District employee personnel issues.  *See Holman v. Williams*, 436 F. Supp. 2d 68, 74 (D.D.C. 2006) ("Preemption by the CMPA divests the trial court—whether it be the Superior Court or [federal] Court—of subject matter jurisdiction").  Thus, in relation to either Superior Court or District Court the OEA stands as a complementary tribunal, as opposed to an alternative forum.

*See Robinson v. District of Columbia*, 748 A.2d 409, 411 (D.C. 2000) ("Superior Court is not an 'alternative forum'" of the OEA).[1]  Depending on the character of the claims either the OEA or one of the District's trial courts is appropriate.

However, unlike the OEA, the District Court does not have a discrete subset of employment-related claims that are the exclusive province of federal court.  Rather, instead of complementing the jurisdiction of Superior Court (as does the OEA), the District Court has largely concurrent jurisdiction with Superior Court.  *See Herrion v. Children's Hosp. Nat. Medical Center*, 786 F. Supp. 2d 359, 370 n. 8 (D.D.C. 2011) ("it is well-established that state courts have concurrent jurisdiction [with district courts] over claims arising under Section 1983").  Nearly any federal employment claim that could be brought in District Court could also be brought in Superior Court.

This distinction demonstrates that the justification for preserving a plaintiff-employee's right to bring claims before the OEA does not exist for preserving that employee's ability to later relitigate the same factual issues in District Court.  The OEA must always remain open to litigants because it is the only forum with jurisdiction to adjudicate certain RIF-related claims. *See Bowers v. District of Columbia*, 883 F. Supp. 2d 1, 10 (D.D.C. 2011) ("courts in this district have consistently dismissed claims brought by D.C. employees for lack of subject matter jurisdiction when the CMPA places those claims under the jurisdiction of the OEA").  But the

---

[1]     Although irrelevant to the point made herein, the District notes that Superior Court does serve as an appellate court for OEA claims.  *See Lewis v. District of Columbia*, 987 A.2d 1134, 1137 (D.C. 2010) (an aggrieved District employee's "sole recourse to challenge his termination [is] by appeal to the OEA, with judicial review by the Superior Court."); *Robinson v. District of Columbia*, 748 A.2d 409, 411 (D.C. 2000) (ruling that an employee grievance filed as an original complaint must be dismissed because "Superior Court is not an 'alternative forum' [under the CMPA], but rather serves as a 'last resort' for reviewing decisions generated by CMPA procedures"); *see also* D.C. Code § 1-606.03(d).

District Court has the same jurisdiction as Superior Court (with respect to federal employment claims), and thus there is no justification for preserving the right to go to District Court after filing in Superior Court.  This case proves the point.  Plaintiff's union could have brought his ADEA claims in Superior Court, just as his union could have brought his ADEA claims in District Court.  *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991) (noting that Congress has "grant[ed] concurrent jurisdiction over ADEA claims to state and federal courts").  However, Plaintiff's union could not have brought his OEA claims in Superior Court or District Court.

The transcript excerpt provided by Plaintiff reflects Judge Bartnoff's understanding of this jurisdictional limitation.  The Superior Court could not exercise jurisdiction over some of the claims potentially associated with the RIF because the OEA had exclusive jurisdiction over those claims.  But Judge Bartnoff could have assumed jurisdiction over ADEA claims because OEA does not have exclusive jurisdiction over those claims.  Thus, Judge Barnoff's recognition that some claims could be brought before the OEA served a basic fairness principle— a litigant should not be precluded from later bringing a claim in a second forum if the litigant could never bring that claim in the first forum.  However, permitting a plaintiff to pursue claims that were or could have been brought in prior litigation in Superior Court would not serve the same principle— the plaintiff has already had his opportunity to pursue those claims.

**II.     Plaintiff was not denied a full and fair opportunity to litigate his claims in the union litigation.**

Plaintiff claims that the union litigation should not preclude his claims because he "was denied a full and fair opportunity to litigate his claims in the union litigation."  In support, Plaintiff argues that:

1.    "the purpose of the of the Union Litigation was specifically not to address claims similar to Plaintiff's, but simply to determine whether the Union Litigation was governed by the CBA" and

2.    "[t]he Union actively refused input from Plaintiff in his attempts to provide supporting evidence regarding a manufactured shortfall and RIF implementation violations."

[ECF # 39 pp. 4-5].  As set forth below, these arguments fail to establish that Plaintiff "was denied a full and fair opportunity to litigate his claims in the union litigation."  Rather, Plaintiff's union could have brought Plaintiff's claims and Plaintiff, as an active union member who was fully aware of the union litigation, is bound by his union's decision not to bring the instant claims.

A.    Plaintiff has inaccurately characterized the union litigation.

Plaintiff argues that preclusion is unwarranted because the union litigation was designed "simply to determine whether the Union Litigation was governed by the CBA."  The record of the WTU case clearly shows otherwise.  First, the WTU case encompassed more than the CBA, as the WTU also brought a claim pursuant to D.C. Code § 38-172 ("PERAA"), a separate claim with a legal basis distinct from the CBA.  [ECF # 24, Ex. # 3, WTU Amended Complaint, Count II].  Second, the WTU case encompassed more than the CBA, because the factual allegations primarily centered around the theory of a pretextual RIF, which has nothing to do with CBA issue.  Finally, whether or not WTU specifically designed their litigation to address Plaintiff's claims is beside the point.  Plaintiff's gripe with such tactical choices necessarily concedes that the WTU had a choice, and therefore, as a privy of the Union, Plaintiff had a choice.  Thus, even

though WTU's case encompassed more than the CBA, even if it did not, Plaintiff cannot

seriously claim he "was denied a full and fair opportunity to litigate his claims."

> B.   Plaintiff's attempt to strategically disassociate from the union litigation is a
> common maneuver that is commonly disregarded.

Plaintiff also argues that preclusion is unwarranted because "[t]he Union actively refused

input from Plaintiff" regarding the RIF.  In support, he provides an affidavit stating that WTU's

president refused to consider evidence that Plaintiff felt relevant and that after he requested

"more comprehensive legal support," Plaintiff was "banned from attending and participating in

WTU Executive Board meetings."  [ECF # 47].  These claims are nothing more than griping over

litigation strategy.  Plaintiff believed that his strategy was better and he should be more involved.

That his union disagreed does not mean that Plaintiff "was denied a full and fair opportunity to

litigate his claims."

Unions are under no obligation to follow the litigation strategy recommendation of a

specific member.  *See Lewis v. Greyhound Lines-East*, 555 F.2d 1053, 1055 (D.C. Cir. 1977) ("a

union does not have to advance… every grievance of its members.  It possesses discretion to

pursue only those grievances it fairly considers to be meritorious").  Rather, union litigation

strategies necessarily require tough choices and a member's disagreement with those choices is

not denial of a full and fair opportunity to litigate.  *See Sullivan v. American Airlines*, Inc., 613 F.

Supp. 226, 231 (D.C.N.Y. 1985) (when the plaintiff asked his union to appeal a decision, but his

union refused, the court held that the plaintiff was not denied a full and fair opportunity to

litigate his claims).  Such disagreement is a common tension with union litigation since "the very

nature of collective bargaining requires an agent to balance interests that quite often are

contradictory."  *Caudle v. Pan American World Airways, Inc.*, 676 F. Supp. 314, 317 (D.D.C.

1987).  In fact, it is quite common for union members to complain about litigation strategy after

it has proved ineffective.  *See Barr v. United Parcel Serv., Inc.*, 868 F.2d 36, 43 (2d Cir. 1989)

("[i]n hindsight, any decision a union makes in the informal yet complex process of handling its

members' grievances may appear to the losing employee to have been erroneous").

 That is the situation in this case.  Plaintiff seeks to disassociate himself from the WTU

case by complaining that WTU improperly handled the case and did not acknowledge his

concerns.  But such gripes are common to large scale union litigation and to some extent intrinsic

to it.  Thus, Plaintiff's *post hoc* disagreement with litigation strategy is neither remarkable, nor a

basis for overcoming claims or issue preclusion.

 Plaintiff's argument also lacks factual support.  Although he depicts himself as

disassociated from his union, the record proves otherwise.  Plaintiff was a member of the union

when WTU filed its case and still is a member of WTU.  *See generally* Supplemental Complaint;

*see also* ECF # 39-5 p. 2 (where plaintiff states "We, the plaintiffs in the case entitled the

Washington Teachers Union vs. the District of Columbia Public Schools"); *Sullivan*, Inc., 613 F.

Supp. at 232 ("A judgment rendered on behalf of a union binds the members on whose behalf it

sued when they later sue in their individual capacities, and plaintiff, who authorized the Union to

pursue the grievance, is no less bound here").  Moreover, a year after the RIF Plaintiff still

communicated with WTU and appeared to be on good terms, as he thanked the WTU president

for "enlightening presentations [he] made on January 26, 2011."  [ECF # 47-2].  Plaintiff's

affidavit attachments also prove the point.  In each letter requesting litigation support Plaintiff

neither states that he, nor the members of his organization, have terminated their union

membership.  *See* ECF # 47-1, 42-3, 47-4.  Each letter simply seeks *additional* assistance.

 Thus, Plaintiff has postured himself so that he can strategically associate or disassociate

from WTU when it suits his interests.  On December 15, 2009 he disassociated after WTU failed

to win the injunction, while in early 2011 he re-associated with WTU so that he could get "informative and enlightening" legal advice.  Plaintiff essentially concedes this strategy, as in 2011 he asked "[s]hould the WTU not prevail in its case, would individual educators still be able to pursue lawsuits on their own?"  *See* ECF # 47-2.

Accordingly, Plaintiff's gripes about litigation strategy do not establish that he was "denied a full and fair opportunity to litigate his claims."  Rather, his gripes show that he postured himself so that he can strategically associate or disassociate from WTU when it suits his interests.

## Conclusion

*Res judicata* embodies a bedrock legal principle.  A final and contested determination of a set of facts should not be subject to relitigation.  Anything less subverts the basic purpose of judicial determinations— finality.  Plaintiff's efforts since his RIF demonstrate precisely such subversion.  He has repeatedly shifted allegiances and characterizations of his involvement to avoid finality.

Plaintiff maintained his union membership so that he could share in the benefits if WTU succeeded, but then disclaimed association once WTU did not.  He claimed that as executive director of his organization he represented "the wrongfully terminated teachers of the District of Columbia Schools," but now claims that his causes of action are uniquely individual.  He claimed that the District failed to place him on the reemployment priority list, but neglected to mention that he retired before the effective date of the RIF.  *See* ECF # 24, p. 14 and 24-2.  In fact,

there is strong evidence that Plaintiff has known that a group of DCPS teachers had a claim similar

to Plaintiff's dismissed on *res judicata* grounds, but neglected to mention it in his pleadings.[2]

Accordingly, this case is a culmination of Plaintiff's concerted efforts to avoid finality

and get yet an additional chance to litigate whether the 2009 RIF was pretextual.  This Court

should not permit Plaintiff an additional chance.  He had an opportunity to litigate his claims

during the WTU litigation.  Giving him a second chance offends the bedrock principle of

finality.  The Court should enter an order dismissing all Counts of Plaintiff's Complaint, or in the

alternative, enter summary judgment in favor of the District on all counts in the Complaint.


Respectfully Submitted,      IRVIN B. NATHAN
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

*/s/ Jonathan H. Pittman*
JONATHAN H. PITTMAN
Chief, Civil Litigation Division Section III
D.C. Bar No. 430388

*/s/ Joseph A. González*
JOSEPH A. GONZÁLEZ
Assistant Attorney General
D.C. Bar No. 995057

---

[2]    On March 14, 2014 the undersigned discovered the Superior Court matter *Valencia Becks et al. v. District of Columbia, et al.* Civil Action No. 2010 CA 008356 B (Judge Erik P. Christian).  This case also arises out of the 2009 RIF and concerned basically the same theories of liability as does the instant case.  Judge Christian dismissed the case on December 19, 2012 finding that because of Judge Bartnoff's ruling in the WTU case, all but Plaintiff's defamation claim "must be dismissed under the doctrines of res judicata and collateral estoppel."  [See *Becks* opinion, attached hereto as Exhibit # 1].  At least four of the plaintiffs in *Becks* are also listed on the petition Plaintiff provided at ECF # 47-4 p. 2.  Given Plaintiff's admitted interest in litigation strategy, the fact that he specifically asked how individual cases would affect one another, that he started an organization dedicated to legal strategy for the 2009 RIF, and that four of the *Becks* plaintiffs also signed the same petition he did, the District finds it difficult to believe that Plaintiff was unaware of the *Becks* case.

441-4[th] Street, N.W., Sixth Floor South
Washington, D.C.  20001-2714
202-724-5692 (direct)
Joseph.Gonzalez@dc.gov